PARHAM, COMMISSIONER, DEPARTMENT OF
HUMAN RESOURCES OF GEORGIA, ET AL. *v.*
J. R. ET AL.

No. 75–1690.   Argued December 6, 1977—Reargued October 10, 1978—
Decided June 20, 1979

BURGER, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEWART, J., filed an opinion concurring in the judgment, *post*, p. 621. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL and STEVENS, JJ., joined, *post*, p. 625.

*R. Douglas Lackey,* Assistant Attorney General of Georgia, reargued the cause for appellants. With him on the briefs on the original argument were *Arthur K. Bolton,* Attorney General, *Robert S. Stubbs II,* Executive Assistant Attorney General, *Don A. Langham,* First Assistant Attorney General, *Michael J. Bowers,* Senior Assistant Attorney General, and *Carol Atha Cosgrove,* Assistant Attorney General.

*John L. Cromartie, Jr.,* reargued the cause for appellees.

With him on the brief on the original argument was *Gerald R. Tarutis.**

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented in this appeal is what process is constitutionally due a minor child whose parents or guardian seek state administered institutional mental health care for the child and specifically whether an adversary proceeding is required prior to or after the commitment.

I

(a) Appellee [1] J. R., a child being treated in a Georgia state mental hospital, was a plaintiff in this class action [2] based on 42 U. S. C. § 1983, in the District Court for the Middle District of Georgia. Appellants are the State's Commissioner

---

*Briefs of *amici curiae* urging affirmance were filed by *William B. Spann, Jr., John H. Lashly,* and *Daniel L. Skoler* for the American Bar Association; by *Stephen P. Berzon, Marian Wright Edelman,* and *Paul R. Friedman* for the American Orthopsychiatric Association et al.; by *Joel I. Klein* for the American Psychiatric Association et al.; by *Robert L. Walker* for the Child Welfare League of America; by *Stanley C. Van Ness* for the Department of the Public Advocate, Division of Mental Health Advocacy of New Jersey; and by *Robert S. Catz* for the Urban Law Institute.

*Solicitor General McCree, Assistant Attorney General Days, Brian K. Landsberg,* and *Mark L. Gross* filed a brief for the United States as *amicus curiae.*

[1] Pending our review, one of the named plaintiffs before the District Court, J. L., died. Although the individual claim of J. L. is moot, we discuss the facts of this claim because, in part, they form the basis for the District Court's holding.

[2] The class certified by the District Court, without objection by appellants, consisted "of all persons younger than 18 years of age now or hereafter received by any defendant for observation and diagnosis and/or detained for care and treatment at any 'facility' within the State of Georgia pursuant to" Ga. Code § 88–503.1 (1975). Although one witness testified that on any given day there may be 200 children in the class, in December 1975 there were only 140.

of the Department of Human Resources, the Director of the Mental Health Division of the Department of Human Resources, and the Chief Medical Officer at the hospital where appellee was being treated. Appellee sought a declaratory judgment that Georgia's voluntary commitment procedures for children under the age of 18, Ga. Code §§ 88–503.1, 88–503.2 (1975),[3] violated the Due Process Clause of the Fourteenth Amendment and requested an injunction against their future enforcement.

A three-judge District Court was convened pursuant to 28 U. S. C. §§ 2281 (1970 ed.) and 2284. After considering expert and lay testimony and extensive exhibits and after visiting two of the State's regional mental health hospitals, the District Court held that Georgia's statutory scheme was unconstitutional because it failed to protect adequately the appellees' due process rights. *J. L.* v. *Parham,* 412 F. Supp. 112, 139 (1976).

To remedy this violation, the court enjoined future commitments based on the procedures in the Georgia statute. It also commanded Georgia to appropriate and expend whatever amount was "reasonably necessary" to provide nonhospital facilities deemed by the appellant state officials to be the

---

[3] Section 88–503.1 provides:

"The superintendent of any facility may receive for observation and diagnosis . . . any individual under 18 years of age for whom such application is made by his parent or guardian . . . . If found to show evidence of mental illness and to be suitable for treatment, such person may be given care and treatment at such facility and such person may be detained by such facility for such period and under such conditions as may be authorized by law."

Section 88–503.2 provides:

"The superintendent of the facility shall discharge any voluntary patient who has recovered from his mental illness or who has sufficiently improved that the superintendent determines that hospitalization of the patient is no longer desirable."

Section 88–503 was amended in some respects in 1978, but references herein are to the provisions in effect at the time in question.

most appropriate for the treatment of those members of plaintiffs' class, n. 2, *supra,* who could be treated in a less drastic, nonhospital environment. 412 F. Supp., at 139.

Appellants challenged all aspects of the District Court's judgment. We noted probable jurisdiction, 431 U. S. 936, and heard argument during the 1977 Term. The case was then consolidated with *Secretary of Public Welfare* v. *Institutionalized Juveniles, post,* p. 640, and reargued this Term.

(b) J. L., a plaintiff before the District Court who is now deceased, was admitted in 1970 at the age of 6 years to Central State Regional Hospital in Milledgeville, Ga. Prior to his admission, J. L. had received outpatient treatment at the hospital for over two months. J. L.'s mother then requested the hospital to admit him indefinitely.

The admitting physician interviewed J. L. and his parents. He learned that J. L.'s natural parents had divorced and his mother had remarried. He also learned that J. L. had been expelled from school because he was uncontrollable. He accepted the parents' representation that the boy had been extremely aggressive and diagnosed the child as having a "hyperkinetic reaction of childhood."

J. L.'s mother and stepfather agreed to participate in family therapy during the time their son was hospitalized. Under this program, J. L. was permitted to go home for short stays. Apparently his behavior during these visits was erratic. After several months, the parents requested discontinuance of the program.

In 1972, the child was returned to his mother and stepfather on a furlough basis, *i. e.,* he would live at home but go to school at the hospital. The parents found they were unable to control J. L. to their satisfaction, and this created family stress. Within two months, they requested his readmission to Central State. J. L.'s parents relinquished their parental rights to the county in 1974.

Although several hospital employees recommended that J. L.

should be placed in a special foster home with "a warm, supported, truly involved couple," the Department of Family and Children Services was unable to place him in such a setting. On October 24, 1975, J. L. (with J. R.) filed this suit requesting an order of the court placing him in a less drastic environment suitable to his needs.

(c) Appellee J. R. was declared a neglected child by the county and removed from his natural parents when he was 3 months old. He was placed in seven different foster homes in succession prior to his admission to Central State Hospital at the age of 7.

Immediately preceding his hospitalization, J. R. received outpatient treatment at a county mental health center for several months. He then began attending school where he was so disruptive and incorrigible that he could not conform to normal behavior patterns. Because of his abnormal behavior, J. R.'s seventh set of foster parents requested his removal from their home. The Department of Family and Children Services then sought his admission at Central State. The agency provided the hospital with a complete socio-medical history at the time of his admission. In addition, three separate interviews were conducted with J. R. by the admission team of the hospital.

It was determined that he was borderline retarded, and suffered an "unsocialized, aggressive reaction of childhood." It was recommended unanimously that he would "benefit from the structured environment" of the hospital and would "enjoy living and playing with boys of the same age."

J. R.'s progress was re-examined periodically. In addition, unsuccessful efforts were made by the Department of Family and Children Services during his stay at the hospital to place J. R. in various foster homes. On October 24, 1975, J. R. (with J. L.) filed this suit requesting an order of the court placing him in a less drastic environment suitable to his needs.

(d) Georgia Code § 88–503.1 (1975) provides for the volun-

tary admission to a state regional hospital of children such as J. L. and J. R. Under that provision, admission begins with an application for hospitalization signed by a "parent or guardian." Upon application, the superintendent of each hospital is given the power to admit temporarily any child for "observation and diagnosis." If, after observation, the superintendent finds "evidence of mental illness" and that the child is "suitable for treatment" in the hospital, then the child may be admitted "for such period and under such conditions as may be authorized by law."

Georgia's mental health statute also provides for the discharge of voluntary patients. Any child who has been hospitalized for more than five days may be discharged at the request of a parent or guardian. § 88–503.3 (a) (1975). Even without a request for discharge, however, the superintendent of each regional hospital has an affirmative duty to release any child "who has recovered from his mental illness or who has sufficiently improved that the superintendent determines that hospitalization of the patient is no longer desirable." § 88–503.2 (1975).

Georgia's Mental Health Director has not published any statewide regulations defining what specific procedures each superintendent must employ when admitting a child under 18. Instead, each regional hospital's superintendent is responsible for the procedures in his or her facility. There is substantial variation among the institutions with regard to their admission procedures and their procedures for review of patients after they have been admitted. A brief description of the different hospitals' procedures[4] will demonstrate the variety of

---

[4] Although the State has eight regional hospitals, superintendents from only seven of them were deposed. In addition, the District Court referred to only seven hospitals in its list of members of the plaintiff class. Apparently, the eighth hospital, Northwest Regional in Rome, Ga., had no children being treated there. The District Court's order was issued against the State Commissioner of the Department of Human Resources, who is

approaches taken by the regional hospitals throughout the State.

Southwestern Hospital in Thomasville, Ga., was built in 1966. Its children and adolescent program was instituted in 1974. The children and adolescent unit in the hospital has a maximum capacity of 20 beds, but at the time of suit only 10 children were being treated there.

The Southwestern superintendent testified that the hospital has never admitted a voluntary child patient who was not treated previously by a community mental health clinic. If a mental health professional at the community clinic determines that hospital treatment may be helpful for a child, then clinic staff and hospital staff jointly evaluate the need for hospitalization, the proper treatment during hospitalization, and a likely release date. The initial admission decision thus is not made at the hospital.

After a child is admitted, the hospital has weekly reviews of his condition performed by its internal medical and professional staff. There also are monthly reviews of each child by a group composed of hospital staff not involved in the weekly reviews and by community clinic staff people. The average stay for each child who was being treated at Southwestern in 1975 was 100 days.

Atlanta Regional Hospital was opened in 1968. At the time of the hearing before the District Court, 17 children and 21 adolescents were being treated in the hospital's children and adolescent unit.

The hospital is affiliated with nine community mental health centers and has an agreement with them that "persons will be treated in the comprehensive community mental health centers in every possible instance, rather than being hospitalized." The admission criteria at Atlanta Regional for voluntary and involuntary patients are the same. It has a formal policy not

responsible for the activities of all eight hospitals, including Northwest Regional.

to admit a voluntary patient unless the patient is found to be a threat to himself or others. The record discloses that approximately 25% of all referrals from the community centers are rejected by the hospital admissions staff.

After admission, the staff reviews the condition of each child every week. In addition, there are monthly utilization reviews by nonstaff mental health professionals; this review considers a random sample of children's cases. The average length of each child's stay in 1975 was 161 days.

The Georgia Mental Health Institute (GMHI) in Decatur, Ga., was built in 1965. Its children and adolescent unit housed 26 children at the time this suit was brought.

The hospital has a formal affiliation with four community mental health centers. Those centers may refer patients to the hospital only if they certify that "no appropriate alternative resources are available within the client's geographic area." For the year prior to the trial in this case, no child was admitted except through a referral from a clinic. Although the hospital has a policy of generally accepting for 24 hours all referrals from a community clinic, it has a team of staff members who review each admission. If the team finds "no reason not to treat in the community" and the deputy superintendent of the hospital agrees, then it will release the applicant to his home.

After a child is admitted, there must be a review of the admission decision within 30 days. There is also an unspecified periodic review of each child's need for hospitalization by a team of staff members. The average stay for the children who were at GMHI in 1975 was 346 days.

Augusta Regional Hospital was opened in 1969 and is affiliated with 10 community mental health clinics. Its children and adolescent unit housed 14 children in December 1975.

Approximately 90% of the children admitted to the hospital have first received treatment in the community, but not all of them were admitted based on a specific referral from a clinic.

The admission criterion is whether "the child needs hospitalization," and that decision must be approved by two psychiatrists. There is also an informal practice of not admitting a child if his parents refuse to participate in a family therapy program.

The admission decision is reviewed within 10 days by a team of staff physicians and mental health professionals; thereafter, each child is reviewed every week. In addition, every child's condition is reviewed by a team of clinic staff members every 100 days. The average stay for the children at Augusta in December 1975 was 92 days.

Savannah Regional Hospital was built in 1970, and it housed 16 children at the time of this suit. The hospital staff members are also directors of the community mental health clinics.

It is the policy of the hospital that any child seeking admission on a nonemergency basis must be referred by a community clinic. The admission decision must be made by a staff psychiatrist, and it is based on the materials provided by the community clinic, an interview with the applicant, and an interview with the parents, if any, of the child.

Within three weeks after admission of a child, there is review by a group composed of hospital and clinic staff members and people from the community, such as juvenile court judges. Thereafter, the hospital staff reviews each child weekly. If the staff concludes that a child is ready to be released, then the community committee reviews the child's case to assist in placement. The average stay of the children being treated at Savannah in December 1975 was 127 days.

West Central Hospital in Columbus, Ga., was opened in December 1974, and it was organized for budgetary purposes with several community mental health clinics. The hospital itself has only 20 beds for children and adolescents, 16 of which were occupied at the time this suit was filed.

There is a formal policy that all children seeking admission to the hospital must be referred by a community clinic. The hospital is regarded by the staff as "the last resort in treating

a child"; 50% of the children referred are turned away by the admissions team at the hospital.

After admission, there are staff meetings daily to discuss problem cases. The hospital has a practicing child psychiatrist who reviews cases once a week. Depending on the nature of the problems, the consultant reviews between 1 and 20 cases. The average stay of the children who were at West Central in December 1975 was 71 days.

The children's unit at Central State Regional Hospital in Milledgeville, Ga., was added to the existing structure during the 1970's. It can accommodate 40 children. The hospital also can house 40 adolescents. At the time of suit, the hospital housed 37 children under 18, including both named plaintiffs.

Although Central State is affiliated with community clinics, it seems to have a higher percentage of nonreferral admissions than any of the other hospitals. The admission decision is made by an "admissions evaluator" and the "admitting physician." The evaluator is a Ph. D. in psychology, a social worker, or a mental-health-trained nurse. The admitting physician is a psychiatrist. The standard for admission is "whether or not hospitalization is the more appropriate treatment" for the child. From April 1974 to November 1975, 9 of 29 children applicants screened for admission were referred to noninstitutional settings.

All children who are temporarily admitted are sent to the children and adolescent unit for testing and development of a treatment plan. Generally, seven days after the admission, members of the hospital staff review all of the information compiled about a patient "to determine the need for continued hospitalization." Thereafter, there is an informal review of the patient approximately every 60 days. The patients who were at Central State in December 1975 had been there, on the average, 456 days. There is no explanation in the record for this large variation from the average length of hospitalization at the other institutions.

Although most of the focus of the District Court was on the State's mental hospitals, it is relevant to note that Georgia presently funds over 50 community mental health clinics and 13 specialized foster care homes. The State has built seven new regional hospitals within the past 15 years, and it has added a new children's unit to its oldest hospital. The state budget in fiscal year 1976 was almost $150 million for mental health care. Georgia ranks 22d among the states in per capita expenditures for mental health and 15th in total expenditures.[5]

The District Court nonetheless rejected the State's entire system of providing mental health care on both procedural and substantive grounds. The District Court found that 46 children could be "optimally cared for in another, less restrictive, non-hospital setting if it were available." 412 F. Supp., at 124–125. These "optimal" settings included group homes, therapeutic camps, and home-care services. The Governor of Georgia and the chairmen of the two Appropriations Committees of its legislature, testifying in the District Court, expressed confidence in the Georgia program and informed the court that the State could not justify enlarging its budget during fiscal year 1977 to provide the specialized treatment settings urged by appellees in addition to those then available.

Having described the factual background of Georgia's mental health program and its treatment of the named plaintiffs, we turn now to examine the legal bases for the District Court's judgment.

## II

In holding unconstitutional Georgia's statutory procedure for voluntary commitment of juveniles, the District Court first determined that commitment to any of the eight regional

---

[5] The source for these data is National Association of State Mental Health Program Directors, State Report: State Mental Health Agency Expenditures (Aug. 1, 1978).

hospitals[6] constitutes a severe deprivation of a child's liberty. The court defined this liberty interest in terms of both freedom from bodily restraint and freedom from the "emotional and psychic harm" caused by the institutionalization.[7] Having determined that a liberty interest is implicated by a child's admission to a mental hospital, the court considered what process is required to protect that interest. It held that the process due "includes at least the right after notice to be heard before an impartial tribunal." 412 F. Supp., at 137.

In requiring the prescribed hearing, the court rejected Georgia's argument that no adversary-type hearing was required since the State was merely assisting parents who could not afford private care by making available treatment similar to that offered in private hospitals and by private physicians. The court acknowledged that most parents who seek to have their children admitted to a state mental hospital do so in good faith. It, however, relied on one of appellees' witnesses who expressed an opinion that "some still look upon mental hospitals as a 'dumping ground.'" Id., at 138.[8] No specific

[6] The record is very sparse with regard to the physical facilities and daily routines at the various regional hospitals. The only hospital discussed by appellees' expert witness was Central State. The District Court visited Central State and one other hospital, but did not discuss the visits in its opinion.

[7] In both respects, the District Court found strong support for its holding in this Court's decision in In re Gault, 387 U. S. 1 (1967). In that decision, we held that a state cannot institutionalize a juvenile delinquent without first providing certain due process protections.

[8] In light of the District Court's holding that a judicial or quasi-judicial body should review voluntary commitment decisions, it is at least interesting to note that the witness who made the statement quoted in the text was not referring to parents as the people who "dump" children into hospitals. This witness opined that some juvenile court judges and child welfare agencies misused the hospitals. App. 768. See also Rolfe & MacClintock, The Due Process Rights of Minors "Voluntarily Admitted" to Mental Institutions, 4 J. Psychiatry & L. 333, 351 (1976) (hereinafter Rolfe & MacClintock).

evidence of such "dumping," however, can be found in the record.

The District Court also rejected the argument that review by the superintendents of the hospitals and their staffs was sufficient to protect the child's liberty interest. The court held that the inexactness of psychiatry, coupled with the possibility that the sources of information used to make the commitment decision may not always be reliable, made the superintendent's decision too arbitrary to satisfy due process. The court then shifted its focus drastically from what was clearly a procedural due process analysis to what appears to be a substantive due process analysis and condemned Georgia's "officialdom" for its failure, in the face of a state-funded 1973 report [9] outlining the "need" for additional resources to be spent on nonhospital treatment, to provide more resources for noninstitutional mental health care. The court concluded that there was a causal relationship between this intransigence and the State's ability to provide any "flexible due process" to the appellees. The District Court therefore ordered the State to appropriate and expend such resources as would be necessary to provide nonhospital treatment to those members of appellees' class who would benefit from it.

### III

In an earlier day, the problems inherent in coping with children afflicted with mental or emotional abnormalities were dealt with largely within the family. See S. Brakel & R. Rock, The Mentally Disabled and the Law 4 (1971). Sometimes parents were aided by teachers or a family doctor. While some parents no doubt were able to deal with their disturbed

---

[9] This study was conducted by the Study Commission on Mental Health Services for Children and Youth and was financed by the State of Georgia. The Commission was made up of eight distinguished scholars in the field of mental health. They spent six months studying the five regional hospitals that were in existence at that time.

children without specialized assistance, others, especially those of limited means and education, were not. Increasingly, they turned for assistance to local, public sources or private charities. Until recently, most of the states did little more than provide custodial institutions for the confinement of persons who were considered dangerous. *Id.,* at 5–6; Slovenko, Criminal Justice Procedures in Civil Commitment, 24 Wayne L. Rev. 1, 3 (1977) (hereinafter Slovenko).

As medical knowledge about the mentally ill and public concern for their condition expanded, the states, aided substantially by federal grants,[10] have sought to ameliorate the human tragedies of seriously disturbed children. Ironically, as most states have expanded their efforts to assist the mentally ill, their actions have been subjected to increasing litigation and heightened constitutional scrutiny. Courts have been required to resolve the thorny constitutional attacks on state programs and procedures with limited precedential guidance. In this case, appellees have challenged Georgia's procedural and substantive balance of the individual, family, and social interests at stake in the voluntary commitment of a child to one of its regional mental hospitals.

The parties agree that our prior holdings have set out a general approach for testing challenged state procedures under a due process claim. Assuming the existence of a protectible property or liberty interest, the Court has required a balancing of a number of factors:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute

[10] See, *e. g.,* Community Health Centers Act, 77 Stat. 290, as amended, 42 U. S. C. § 2689 *et seq.*

procedural requirement would entail." *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976), quoted in *Smith* v. *Organization of Foster Families,* 431 U. S. 816, 848–849 (1977).

In applying these criteria, we must consider first the child's interest in not being committed. Normally, however, since this interest is inextricably linked with the parents' interest in and obligation for the welfare and health of the child, the private interest at stake is a combination of the child's and parents' concerns.[11] Next, we must examine the State's interest in the procedures it has adopted for commitment and treatment of children. Finally, we must consider how well Georgia's procedures protect against arbitrariness in the decision to commit a child to a state mental hospital.

(a) It is not disputed that a child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment and that the state's involvement in the commitment decision constitutes state action under the Fourteenth Amendment. See *Addington* v. *Texas,* 441 U. S. 418, 425 (1979); *In re Gault,* 387 U. S. 1, 27 (1967); *Specht* v. *Patterson,* 386 U. S. 605 (1967). We also recognize that commitment sometimes produces adverse social consequences for the child because of the reaction of some to the discovery that the child has received psychiatric care. Cf. *Addington* v. *Texas, supra,* at 425–426.

This reaction, however, need not be equated with the community response resulting from being labeled by the state as delinquent, criminal, or mentally ill and possibly dangerous. See *ibid.; In re Gault, supra,* at 23; *Paul* v. *Davis,* 424 U. S. 693, 711–712 (1976). The state through its voluntary commitment procedures does not "label" the child; it provides a

---

[11] In this part of the opinion, we will deal with the issues arising when the natural parents of the child seek commitment to a state hospital. In Part IV, we will deal with the situation presented when the child is a ward of the state.

diagnosis and treatment that medical specialists conclude the child requires. In terms of public reaction, the child who exhibits abnormal behavior may be seriously injured by an erroneous decision not to commit. Appellees overlook a significant source of the public reaction to the mentally ill, for what is truly "stigmatizing" is the symptomatology of a mental or emotional illness. *Addington* v. *Texas, supra,* at 429. See also Schwartz, Myers, & Astrachan, Psychiatric Labeling and the Rehabilitation of the Mental Patient, 31 Archives of General Psychiatry 329 (1974).[12] The pattern of untreated, abnormal behavior—even if nondangerous—arouses at least as much negative reaction as treatment that becomes public knowledge. A person needing, but not receiving, appropriate medical care may well face even greater social ostracism resulting from the observable symptoms of an untreated disorder.[13]

However, we need not decide what effect these factors might have in a different case. For purposes of this decision, we assume that a child has a protectible interest not only in being free of unnecessary bodily restraints but also in not being labeled erroneously by some persons because of an improper decision by the state hospital superintendent.

(b) We next deal with the interests of the parents who have decided, on the basis of their observations and independent professional recommendations, that their child needs institu-

---

[12] See also Gove & Fain, The Stigma of Mental Hospitalization, 28 Archives of General Psychiatry 494, 500 (1973); Phillips, Rejection of the Mentally Ill: The Influence of Behavior and Sex, 29 Am. Sociological Rev. 679, 686–687 (1964). Research by Schwartz, Myers, and Astrachan and that of Gove and Fain found "that the stigma of mental hospitalization is not a major problem for the ex-patient." Schwartz, Myers, & Astrachan, Psychiatric Labeling and the Rehabilitation of the Mental Patient, 31 Archives of General Psychiatry 329, 333 (1974).

[13] As Schwartz, Myers, and Astrachan concluded:

"Discharge [from a mental hospital] before disturbed behavior is well controlled may advance the patient into an inhospitable world that can incubate the chronicity that was to be avoided in the first place." *Id.,* at 334.

tional care. Appellees argue that the constitutional rights of the child are of such magnitude and the likelihood of parental abuse is so great that the parents' traditional interests in and responsibility for the upbringing of their child must be subordinated at least to the extent of providing a formal adversary hearing prior to a voluntary commitment.

Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course; our constitutional system long ago rejected any notion that a child is "the mere creature of the State" and, on the contrary, asserted that parents generally "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations." *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535 (1925). See also *Wisconsin* v. *Yoder,* 406 U. S. 205, 213 (1972); *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944); *Meyer* v. *Nebraska,* 262 U. S. 390, 400 (1923). Surely, this includes a "high duty" to recognize symptoms of illness and to seek and follow medical advice. The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children. 1 W. Blackstone, Commentaries *447; 2 J. Kent, Commentaries on American Law *190.

As with so many other legal presumptions, experience and reality may rebut what the law accepts as a starting point; the incidence of child neglect and abuse cases attests to this. That some parents "may at times be acting against the interests of their children" as was stated in *Bartley* v. *Kremens,* 402 F. Supp. 1039, 1047–1048 (ED Pa. 1975), vacated and remanded, 431 U. S. 119 (1977), creates a basis for caution, but is hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the

child's best interests. See Rolfe & MacClintock 348–349. The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition.

Nonetheless, we have recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized. See *Wisconsin* v. *Yoder, supra,* at 230; *Prince* v. *Massachusetts, supra,* at 166. Moreover, the Court recently declared unconstitutional a state statute that granted parents an absolute veto over a minor child's decision to have an abortion. *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52 (1976). Appellees urge that these precedents limiting the traditional rights of parents, if viewed in the context of the liberty interest of the child and the likelihood of parental abuse, require us to hold that the parents' decision to have a child admitted to a mental hospital must be subjected to an exacting constitutional scrutiny, including a formal, adversary, pre-admission hearing.

Appellees' argument, however, sweeps too broadly. Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state. The same characterizations can be made for a tonsillectomy, appendectomy, or other medical procedure. Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments. Here, there is no finding by the District Court of even a single instance of bad faith by any parent of any member of appellees' class. We cannot assume that the result in *Meyer* v. *Nebraska, supra,* and *Pierce* v. *Society of Sisters, supra,* would have been different if the children there had announced a preference to learn only English or a preference to go to a public, rather than a church,

school. The fact that a child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority to decide what is best for the child. See generally Goldstein, Medical Care for the Child at Risk: On State Supervention of Parental Autonomy, 86 Yale L. J. 645, 664–668 (1977); Bennett, Allocation of Child Medical Care Decisionmaking Authority: A Suggested Interest Analysis, 62 Va. L. Rev. 285, 308 (1976). Neither state officials nor federal courts are equipped to review such parental decisions.

Appellees place particular reliance on *Planned Parenthood,* arguing that its holding indicates how little deference to parents is appropriate when the child is exercising a constitutional right. The basic situation in that case, however, was very different; *Planned Parenthood* involved an absolute parental veto over the child's ability to obtain an abortion. Parents in Georgia in no sense have an absolute right to commit their children to state mental hospitals; the statute requires the superintendent of each regional hospital to exercise independent judgment as to the child's need for confinement. See *supra,* at 591.

In defining the respective rights and prerogatives of the child and parent in the voluntary commitment setting, we conclude that our precedents permit the parents to retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and that the traditional presumption that the parents act in the best interests of their child should apply. We also conclude, however, that the child's rights and the nature of the commitment decision are such that parents cannot always have absolute and unreviewable discretion to decide whether to have a child institutionalized. They, of course, retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment.

(c) The State obviously has a significant interest in con-

fining the use of its costly mental health facilities to cases of genuine need. The Georgia program seeks first to determine whether the patient seeking admission has an illness that calls for inpatient treatment. To accomplish this purpose, the State has charged the superintendents of each regional hospital with the responsibility for determining, before authorizing an admission, whether a prospective patient is mentally ill and whether the patient will likely benefit from hospital care. In addition, the State has imposed a continuing duty on hospital superintendents to release any patient who has recovered to the point where hospitalization is no longer needed.

The State in performing its voluntarily assumed mission also has a significant interest in not imposing unnecessary procedural obstacles that may discourage the mentally ill or their families from seeking needed psychiatric assistance. The *parens patriae* interest in helping parents care for the mental health of their children cannot be fulfilled if the parents are unwilling to take advantage of the opportunities because the admission process is too onerous, too embarrassing, or too contentious. It is surely not idle to speculate as to how many parents who believe they are acting in good faith would forgo state-provided hospital care if such care is contingent on participation in an adversary proceeding designed to probe their motives and other private family matters in seeking the voluntary admission.

The State also has a genuine interest in allocating priority to the diagnosis and treatment of patients as soon as they are admitted to a hospital rather than to time-consuming procedural minuets before the admission.[14] One factor that must

---

[14] Judge Friendly has cogently pointed out:

"It should be realized that procedural requirements entail the expenditure of limited resources, that at some point the benefit to individuals from an additional safeguard is substantially outweighed by the cost of providing such protection, and that the expense of protecting those likely to be found undeserving will probably come out of the pockets of the

be considered is the utilization of the time of psychiatrists, psychologists, and other behavioral specialists in preparing for and participating in hearings rather than performing the task for which their special training has fitted them. Behavioral experts in courtrooms and hearings are of little help to patients.

The *amici* brief of the American Psychiatric Association et al. points out at page 20 that the average staff psychiatrist in a hospital presently is able to devote only 47% of his time to direct patient care. One consequence of increasing the procedures the state must provide prior to a child's voluntary admission will be that mental health professionals will be diverted even more from the treatment of patients in order to travel to and participate in—and wait for—what could be hundreds—or even thousands—of hearings each year. Obviously the cost of these procedures would come from the public moneys the legislature intended for mental health care. See Slovenko 34–35.

(d) We now turn to consideration of what process protects adequately the child's constitutional rights by reducing risks of error without unduly trenching on traditional parental authority and without undercutting "efforts, to further the legitimate interests of both the state and the patient that are served by" voluntary commitments. *Addington* v. *Texas,* 441 U. S., at 430. See also *Mathews* v. *Eldridge,* 424 U. S., at 335. We conclude that the risk of error inherent in the parental decision to have a child institutionalized for mental health care is sufficiently great that some kind of inquiry should be made by a "neutral factfinder" to determine whether the statutory requirements for admission are satisfied. See *Goldberg* v. *Kelly,* 397 U. S. 254, 271 (1970); *Morrissey* v. *Brewer,* 408 U. S. 471, 489 (1972). That inquiry must care-

---

deserving." Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267, 1276 (1975). See also *Wheeler* v. *Montgomery,* 397 U. S. 280, 282 (1970) (dissenting opinion).

fully probe the child's background using all available sources, including, but not limited to, parents, schools, and other social agencies. Of course, the review must also include an interview with the child. It is necessary that the decisionmaker have the authority to refuse to admit any child who does not satisfy the medical standards for admission. Finally, it is necessary that the child's continuing need for commitment be reviewed periodically by a similarly independent procedure.[15]

We are satisfied that such procedures will protect the child from an erroneous admission decision in a way that neither unduly burdens the states nor inhibits parental decisions to seek state help.

Due process has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer. See *Goldberg* v. *Kelly, supra,* at 271; *Morrissey* v. *Brewer, supra,* at 489. Surely, this is the case as to medical decisions, for "neither judges nor administrative hearing officers are better qualified than psychiatrists to render psychiatric judgments." *In re Roger S.,* 19 Cal. 3d 921, 942, 569 P. 2d 1286, 1299 (1977) (Clark, J., dissenting). Thus, a staff physician will suffice, so long as he or she is free to evaluate independently the child's mental and emotional condition and need for treatment.

It is not necessary that the deciding physician conduct a formal or quasi-formal hearing. A state is free to require such a hearing, but due process is not violated by use of informal, traditional medical investigative techniques. Since well-established medical procedures already exist, we do not undertake to outline with specificity precisely what this investigation must involve. The mode and procedure of medical

---

[15] As we discuss more fully later, *infra,* at 617, the District Court did not decide and we therefore have no reason to consider at this time what procedures for review are independently necessary to justify continuing a child's confinement. We merely hold that a subsequent, independent review of the patient's condition provides a necessary check against possible arbitrariness in the *initial* admission decision.

diagnostic procedures is not the business of judges. What is best for a child is an individual medical decision that must be left to the judgment of physicians in each case. We do no more than emphasize that the decision should represent an independent judgment of what the child requires and that all sources of information that are traditionally relied on by physicians and behavioral specialists should be consulted.

What process is constitutionally due cannot be divorced from the nature of the ultimate decision that is being made. Not every determination by state officers can be made most effectively by use of "the procedural tools of judicial or administrative decisionmaking." *Board of Curators of Univ. of Missouri* v. *Horowitz,* 435 U. S. 78, 90 (1978). See also *Greenholtz* v. *Nebraska Penal Inmates, ante,* at 13–14; *Cafeteria & Restaurant Workers* v. *McElroy,* 367 U. S. 886, 895 (1961).[16]

---

[16] Relying on general statements from past decisions dealing with governmental actions not even remotely similar to those involved here, the dissent concludes that if a protectible interest is involved then there must be some form of traditional, adversary, judicial, or administrative hearing either before or after its deprivation. That result is mandated, in their view, regardless of what process the state has designed to protect the individual and regardless of what the record demonstrates as to the fairness of the state's approach.

The dissenting approach is inconsistent with our repeated assertion that "due process is *flexible* and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972) (emphasis added). Just as there is no requirement as to exactly what procedures to employ whenever a traditional judicial-type hearing is mandated, compare *Goss* v. *Lopez,* 419 U. S. 565 (1975); *Wolff* v. *McDonnell,* 418 U. S. 539 (1974); *Morrissey* v. *Brewer, supra,* with *Goldberg* v. *Kelly,* 397 U. S. 254 (1970), there is no reason to require a judicial-type hearing in all circumstances. As the scope of governmental action expands into new areas creating new controversies for judicial review, it is incumbent on courts to design procedures that protect the rights of the individual without unduly burdening the legitimate efforts of the states to deal with difficult social problems. The judicial model for factfinding for all constitutionally protected interests, regardless of their nature, can turn rational decisionmaking into an unmanageable enterprise.

Here, the questions are essentially medical in character: whether the child is mentally or emotionally ill and whether he can benefit from the treatment that is provided by the state. While facts are plainly necessary for a proper resolution of those questions, they are only a first step in the process. In an opinion for a unanimous Court, we recently stated in *Addington* v. *Texas*, 441 U. S., at 429, that the determination of whether a person is mentally ill "turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists."

Although we acknowledge the fallibility of medical and psychiatric diagnosis, see *O'Connor* v. *Donaldson*, 422 U. S. 563, 584 (1975) (concurring opinion), we do not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to an untrained judge or administrative hearing officer after a judicial-type hearing. Even after a hearing, the nonspecialist decisionmaker must make a medical-psychiatric decision. Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real. See Albers, Pasewark, & Meyer, Involuntary Hospitalization and Psychiatric Testimony: The Fallibility of the Doctrine of Immaculate Perception, 6 Cap. U. L. Rev. 11, 15 (1976).[17]

---

[17] See Albers & Pasewark, Involuntary Hospitalization: Surrender at the Courthouse, 2 Am. J. Community Psychology 287, 288 (1974) (mean hearing time for 21 of 300 consecutive commitment cases was 9.2 minutes); Miller & Schwartz, County Lunacy Commission Hearings: Some Observations of Commitments to a State Mental Hospital, 14 Social Prob. 26 (1966) (mean time for hearings was 3.8 minutes); Scheff, The Societal Reaction to Deviance: Ascriptive Elements in the Psychiatric Screening of Mental

Another problem with requiring a formalized, factfinding hearing lies in the danger it poses for significant intrusion into the parent-child relationship. Pitting the parents and child as adversaries often will be at odds with the presumption that parents act in the best interests of their child. It is one thing to require a neutral physician to make a careful review of the parents' decision in order to make sure it is proper from a medical standpoint; it is a wholly different matter to employ an adversary contest to ascertain whether the parents' motivation is consistent with the child's interests.

Moreover, it is appropriate to inquire into how such a hearing would contribute to the successful long-range treatment of the patient. Surely, there is a risk that it would exacerbate whatever tensions already exist between the child and the parents. Since the parents can and usually do play a significant role in the treatment while the child is hospitalized and even more so after release, there is a serious risk that an adversary confrontation will adversely affect the ability of the parents to assist the child while in the hospital. Moreover, it will make his subsequent return home more difficult. These unfortunate results are especially critical with an emotionally disturbed child; they seem likely to occur in the context of an adversary hearing in which the parents testify. A confrontation over such intimate family relationships would distress the normal adult parents and the impact on a disturbed child almost certainly would be significantly greater.[18]

---

Patients in a Midwestern State, 11 Social Prob. 401 (1964) (average hearing lasted 9.2 minutes). See also Cohen, The Function of the Attorney and the Commitment of the Mentally Ill, 44 Texas L. Rev. 424 (1966).

[18] While not altogether clear, the District Court opinion apparently contemplated a hearing preceded by a written notice of the proposed commitment. At the hearing the child presumably would be given an opportunity to be heard and present evidence, and the right to cross-examine witnesses, including, of course, the parents. The court also

It has been suggested that a hearing conducted by someone other than the admitting physician is necessary in order to detect instances where parents are "guilty of railroading their children into asylums" or are using "voluntary commitment procedures in order to sanction behavior of which they disapprov[e]." Ellis, Volunteering Children: Parental Commitment of Minors to Mental Institutions, 62 Calif. L. Rev. 840, 850–851 (1974). See also *J. L.* v. *Parham,* 412 F. Supp., at 133; Brief for Appellees 38. Curiously, it seems to be taken for granted that parents who seek to "dump" their children on the state will inevitably be able to conceal their motives and thus deceive the admitting psychiatrists and the other mental health professionals who make and review the admission decision. It is elementary that one early diagnostic inquiry into the cause of an emotional disturbance of a child is an examination into the environment of the child. It is unlikely, if not inconceivable, that a decision to abandon an emotionally normal, healthy child and thrust him into an institution will be a discrete act leaving no trail of circumstances. Evidence of such conflicts will emerge either in the interviews or from secondary sources. It is unrealistic to believe that trained psychiatrists, skilled in eliciting responses, sorting medically relevant facts, and sensing motivational nuances will often be deceived about the family situation surrounding

---

required an impartial trier of fact who would render a written decision reciting the reasons for accepting or rejecting the parental application.

Since the parents in this situation are seeking the child's admission to the state institution, the procedure contemplated by the District Court presumably would call for some other person to be designated as a guardian *ad litem* to act for the child. The guardian, in turn, if not a lawyer, would be empowered to retain counsel to act as an advocate of the child's interest.

Of course, a state may elect to provide such adversary hearings in situations where it perceives that parents and a child may be at odds, but nothing in the Constitution compels such procedures.

a child's emotional disturbance.[19]  Surely a lay, or even law-trained, factfinder would be no more skilled in this process than the professional.

By expressing some confidence in the medical decision-making process, we are by no means suggesting it is error free. On occasion, parents may initially mislead an admitting physician or a physician may erroneously diagnose the child as needing institutional care either because of negligence or an overabundance of caution.  That there may be risks of error in the process affords no rational predicate for holding unconstitutional an entire statutory and administrative scheme that is generally followed in more than 30 states.[20]  "[P]ro-

---

[19] In evaluating the problem of detecting "dumping" by parents, it is important to keep in mind that each of the regional hospitals has a continuing relationship with the Department of Family and Children Services.  The staffs at those hospitals refer cases to the Department when they suspect a child is being mistreated and thus are sensitive to this problem.  In fact, J. L.'s situation is in point.  The family conflicts and problems were well documented in the hospital records.  Equally well documented, however, were the child's severe emotional disturbances and his need for treatment.

[20] Alaska Stat. Ann. § 47.30.020 (1975) ; Ariz. Rev. Stat. Ann. §§ 36–518, 36–519 (1974) ; Ark. Stat. Ann. § 59–405 (B) (1971) ; Cal. Welf. & Inst. Code Ann. § 6000 (West Supp. 1979) ; D. C. Code §§ 21–511, 21–512 (1973) ; Fla. Stat. § 394.465 (1)(a) (Supp. 1979) ; Ga. Code §§ 88–503.1, 88–503.2 (1978) ; Haw. Rev. Stat. § 334–60 (a)(2) (1976) (only for child less than 15) ; Idaho Code §§ 66–318, 66–320 (Supp. 1978) (parent may admit child under 14, but child over 16 may obtain release) ; Ill. Rev. Stat., ch. 91½, §§ 3–502, 3–503 (Supp. 1978) ; Ind. Code § 16–14–9.1–2 (1976) ; Kan. Stat. Ann. §§ 59–2905, 59–2907 (Supp. 1978) ; Ky. Rev. Stat. § 202A.020 (1977) ; La. Rev. Stat. Ann. § 28:57 (C) (West Supp. 1979) ; Md. Ann. Code, Art. 59, § 11 (g) (Supp. 1978) (parental consent permissible only to some facilities) ; Mass. Gen. Laws Ann., ch. 123, § 10 (a) (West Supp. 1979) ; Mich. Comp. Laws § 330.1415 (1976) (child may object within 30 days and receive a hearing) ; Miss. Code Ann. § 41–21–103 (1) (Supp. 1978) (certificate of need for treatment from two physicians required) ; Mo. Rev. Stat. §§ 202.115 (1)(2), 202.115 (2)(2) (1978) ; Nev. Rev. Stat. §§ 422A.560, 433A.540 (1975) ; N. Y. Mental Hyg. Law § 9.13

cedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Mathews* v. *Eldridge,* 424 U. S., at 344. In general, we are satisfied that an independent medical decisionmaking process, which includes the thorough psychiatric investigation described earlier, followed by additional periodic review of a child's condition, will protect children who should not be admitted; we do not believe the risks of error in that process would be significantly reduced by a more formal, judicial-type hearing. The issue remains whether the Georgia practices, as described in the record before us, comport with these minimum due process requirements.

(e) Georgia's statute envisions a careful diagnostic medical inquiry to be conducted by the admitting physician at each regional hospital. The *amicus* brief for the United States explains, at pages 7–8:

"[I]n every instance the decision whether or not to accept the child for treatment is made by a physician employed by the State . . . .

"That decision is based on interviews and recommendations by hospital or community health center staff. The staff interviews the child and the parent or guardian who brings the child to the facility . . . [and] attempts are

(McKinney 1978) (parent may admit, but child may obtain own release); N. D. Cent. Code § 25–03.1–04 (Supp. 1977); Ohio Rev. Code Ann. § 5122.02 (B) (Supp. 1978); Okla. Stat., Tit. 43A, § 184 (1971); Ore. Rev. Stat. § 426.220 (1) (1977); Pa. Stat. Ann., Tit. 50, § 7201 (Purdon Supp. 1978–1979) (only for child less than 14); R. I. Gen. Laws § 26–2–8 (Supp. 1978) (requires certificate of two physicians that child is insane); S. C. Code § 44–17–310 (2) (Supp. 1978); S. D. Comp. Laws Ann. § 27A–8–2 (1976); Tenn. Code Ann. § 33–601 (a)(1) (1977); Utah Code Ann §§ 64–7–29, 64–7–31 (2) (1953); Wash. Rev. Code § 72.23.070 (2) (1978) (child over 13 also must consent); W. Va. Code § 27–4–1 (b) (1976) (consent of child over 12 required); Wyo. Stat. § 25–3–106 (a)(i) (1977).

made to communicate with other possible sources of information about the child . . . ."

Focusing primarily on what it saw as the absence of any formal mechanism for review of the physician's initial decision, the District Court unaccountably saw the medical decision as an exercise of "unbridled discretion." 412 F. Supp., at 136. But extravagant characterizations are no substitute for careful analysis, and we must examine the Georgia process in its setting to determine if, indeed, any one person exercises such discretion.

In the typical case, the parents of a child initially conclude from the child's behavior that there is some emotional problem—in short, that "something is wrong." They may respond to the problem in various ways, but generally the first contact with the State occurs when they bring the child to be examined by a psychologist or psychiatrist at a community mental health clinic.

Most often, the examination is followed by outpatient treatment at the community clinic. In addition, the child's parents are encouraged, and sometimes required, to participate in a family therapy program to obtain a better insight into the problem. In most instances, this is all the care a child requires. However, if, after a period of outpatient care, the child's abnormal emotional condition persists, he may be referred by the local clinic staff to an affiliated regional mental hospital.

At the regional hospital an admissions team composed of a psychiatrist and at least one other mental health professional examines and interviews the child—privately in most instances. This team then examines the medical records provided by the clinic staff and interviews the parents. Based on this information, and any additional background that can be obtained, the admissions team makes a diagnosis and determines whether the child will likely benefit from institution-

alized care. If the team finds either condition not met, admission is refused.

If the team admits a child as suited for hospitalization, the child's condition and continuing need for hospital care are reviewed periodically by at least one independent, medical review group. For the most part, the reviews are as frequent as weekly, but none are less often than once every two months. Moreover, as we noted earlier, the superintendent of each hospital is charged with an affirmative statutory duty to discharge any child who is no longer mentally ill or in need of therapy.[21]

As with most medical procedures, Georgia's are not totally free from risk of error in the sense that they give total or absolute assurance that every child admitted to a hospital has a mental illness optimally suitable for institutionalized treatment. But it bears repeating that "procedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." *Mathews* v. *Eldridge, supra,* at 344.

Georgia's procedures are not "arbitrary" in the sense that a single physician or other professional has the "unbridled discretion" the District Court saw to commit a child to a regional hospital. To so find on this record would require us to assume that the physicians, psychologists, and mental health professionals who participate in the admission decision and who review each other's conclusions as to the continuing validity of the initial decision are either oblivious or indifferent to the child's welfare—or that they are incompetent. We note, however, the District Court found to the contrary; it was "impressed by the conscientious, dedicated state em-

---

[21] While the record does demonstrate that the procedures may vary from case to case, it also reflects that no child in Georgia was admitted for indefinite hospitalization without being interviewed personally and without the admitting physician's checking with secondary sources, such as school or work records.

ployed psychiatrists who, with the help of equally conscientious, dedicated state employed psychologists and social workers, faithfully care for the plaintiff children . . . ." 412 F. Supp., at 138.

This finding of the District Court also effectively rebuts the suggestion made in some of the briefs *amici* that hospital administrators may not actually be "neutral and detached" because of institutional pressure to admit a child who has no need for hospital care. That such a practice may take place in some institutions in some places affords no basis for a finding as to Georgia's program; the evidence in the record provides no support whatever for that charge against the staffs at any of the State's eight regional hospitals. Such cases, if they are found, can be dealt with individually; [22] they do not lend themselves to class-action remedies.

We are satisfied that the voluminous record as a whole supports the conclusion that the admissions staffs of the hospitals have acted in a neutral and detached fashion in making medical judgments in the best interests of the children. The State, through its mental health programs, provides the authority for trained professionals to assist parents in examining, diagnosing, and treating emotionally disturbed children. Through its hiring practices, it provides well-staffed and well-equipped hospitals and—as the District Court found—conscientious public employees to implement the State's beneficent purposes.

Although our review of the record in this case satisfies us that Georgia's general administrative and statutory scheme for the voluntary commitment of children is not *per se*

---

[22] One important means of obtaining individual relief for these children is the availability of habeas corpus. As the appellants' brief explains, "Ga. Code § 88–502.11 . . . provides that at any time and without notice a person detained in a facility, or a relative or friend of such person, may petition for a writ of habeas corpus to question the cause and legality of the detention of the person." Brief for Appellants 36–37.

unconstitutional, we cannot decide on this record whether every child in appellees' class received an adequate, independent diagnosis of his emotional condition and need for confinement under the standards announced earlier in this opinion. On remand, the District Court is free to and should consider any individual claims that initial admissions did not meet the standards we have described in this opinion.

In addition, we note that appellees' original complaint alleged that the State had failed to provide adequate periodic review of their need for institutional care and claimed that this was an additional due process violation. Since the District Court held that the appellees' original confinement was unconstitutional, it had no reason to consider this separate claim. Similarly, we have no basis for determining whether the review procedures of the various hospitals are adequate to provide the process called for or what process might be required if a child contests his confinement by requesting a release. These matters require factual findings not present in the District Court's opinion. We have held that the periodic reviews described in the record reduce the risk of error in the initial admission and thus they are necessary. Whether they are sufficient to justify continuing a voluntary commitment is an issue for the District Court on remand. The District Court is free to require additional evidence on this issue.

## IV

(a) Our discussion in Part III was directed at the situation where a child's natural parents request his admission to a state mental hospital. Some members of appellees' class, including J. R., were wards of the State of Georgia at the time of their admission. Obviously their situation differs from those members of the class who have natural parents. While the determination of what process is due varies somewhat when the state, rather than a natural parent, makes the request for commitment, we conclude that the differences

in the two situations do not justify requiring different procedures at the time of the child's initial admission to the hospital.

For a ward of the state, there may well be no adult who knows him thoroughly and who cares for him deeply. Unlike with natural parents where there is a presumed natural affection to guide their action, 1 W. Blackstone, Commentaries *447; 2 J. Kent, Commentaries on American Law *190, the presumption that the state will protect a child's general welfare stems from a specific state statute. Ga. Code § 24A–101 (1978). Contrary to the suggestion of the dissent, however, we cannot assume that when the State of Georgia has custody of a child it acts so differently from a natural parent in seeking medical assistance for the child. No one has questioned the validity of the statutory presumption that the State acts in the child's best interest. Nor could such a challenge be mounted on the record before us. There is no evidence that the State, acting as guardian, attempted to admit any child for reasons unrelated to the child's need for treatment. Indeed, neither the District Court nor the appellees have suggested that wards of the State should receive any constitutional treatment different from children with natural parents.

Once we accept that the State's application for a child's admission to a hospital is made in good faith, then the question is whether the medical decisionmaking approach of the admitting physician is adequate to satisfy due process. We have already recognized that an independent medical judgment made from the perspective of the best interests of the child after a careful investigation is an acceptable means of justifying a voluntary commitment. We do not believe that the soundness of this decisionmaking is any the less reasonable in this setting.

Indeed, if anything, the decision with regard to wards of the State may well be even more reasonable in light of the

extensive written records that are compiled about each child while in the State's custody. In J. R.'s case, the admitting physician had a complete social and medical history of the child before even beginning the diagnosis. After carefully interviewing him and reviewing his extensive files, three physicians independently concluded that institutional care was in his best interests. See *supra,* at 590.

Since the state agency having custody and control of the child *in loco parentis* has a duty to consider the best interests of the child with respect to a decision on commitment to a mental hospital, the State may constitutionally allow that custodial agency to speak for the child, subject, of course, to the restrictions governing natural parents. On this record, we cannot declare unconstitutional Georgia's admission procedures for wards of the State.

(b) It is possible that the procedures required in reviewing a ward's need for continuing care should be different from those used to review the need of a child with natural parents. As we have suggested earlier, the issue of what process is due to justify continuing a voluntary commitment must be considered by the District Court on remand. In making that inquiry, the District Court might well consider whether wards of the State should be treated with respect to continuing therapy differently from children with natural parents.

The absence of an adult who cares deeply for a child has little effect on the reliability of the initial admission decision, but it may have some effect on how long a child will remain in the hospital. We noted in *Addington* v. *Texas,* 441 U. S., at 428–429, that "the concern of family and friends generally will provide continuous opportunities for an erroneous commitment to be corrected." For a child without natural parents, we must acknowledge the risk of being "lost in the shuffle." Moreover, there is at least some indication that J. R.'s commitment was prolonged because the Department of Family and Children Services had difficulty finding a foster

home for him. Whether wards of the State generally have received less protection than children with natural parents, and, if so, what should be done about it, however, are matters that must be decided in the first instance by the District Court on remand,[23] if the court concludes the issue is still alive.

## V

It is important that we remember the purpose of Georgia's comprehensive mental health program. It seeks substantively and at great cost to provide care for those who cannot afford to obtain private treatment and procedurally to screen carefully all applicants to assure that institutional care is suited to the particular patient. The State resists the complex of procedures ordered by the District Court because in its view they are unnecessary to protect the child's rights, they divert public resources from the central objective of administering health care, they risk aggravating the tensions inherent in the family situation, and they erect barriers that may discourage parents from seeking medical aid for a disturbed child.

On this record, we are satisfied that Georgia's medical factfinding processes are reasonable and consistent with constitutional guarantees. Accordingly, it was error to hold unconstitutional the State's procedures for admitting a child for treatment to a state mental hospital. The judgment is

---

[23] To remedy the constitutional violation, the District Court ordered hearings to be held for each member of the plaintiff class, see n. 2, *supra.* For 46 members of the class found to be treatable in "less drastic" settings, the District Court also ordered the State to expend such moneys as were necessary to provide alternative treatment facilities and programs. While the order is more appropriate as a remedy for a substantive due process violation, the court made no findings on that issue. The order apparently was intended to remedy the procedural due process violation it found. Since that judgment is reversed, there is no basis for us to consider the correctness of the remedy.

therefore reversed, and the case is remanded to the District Court for further proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE STEWART, concurring in the judgment.

For centuries it has been a canon of the common law that parents speak for their minor children.[1] So deeply imbedded in our traditions is this principle of law that the Constitution itself may compel a State to respect it. *Meyer* v. *Nebraska,* 262 U. S. 390; *Pierce* v. *Society of Sisters,* 268 U. S. 510.[2] In ironic contrast, the District Court in this case has said that the Constitution *requires* the State of Georgia to *disregard* this established principle. I cannot agree.

---

[1] See 1 W. Blackstone, Commentaries *452–453; 2 J. Kent, Commentaries on American Law *203–206; J. Schouler, A Treatise on the Law of Domestic Relations 335–353 (3d ed. 1882); G. Field, The Legal Relations of Infants 63–80 (1888).

"It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince* v. *Massachusetts,* 321 U. S. 158, 166.

"The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin* v. *Yoder,* 406 U. S. 205, 232.

"Because he may not foresee the consequences of his decision, a minor may not make an enforceable bargain. He may not lawfully work or travel where he pleases, or even attend exhibitions of constitutionally protected adult motion pictures. Persons below a certain age may not marry without parental consent." *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52, 102 (STEVENS, J., concurring in part and dissenting in part).

Cf. *Stump* v. *Sparkman,* 435 U. S. 349, 366 (dissenting opinion).

[2] "The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce* v. *Society of Sisters,* 268 U. S., at 535.

There can be no doubt that commitment to a mental institution results in a "massive curtailment of liberty," *Humphrey* v. *Cady,* 405 U. S. 504, 509. In addition to the physical confinement involved, *O'Connor* v. *Donaldson,* 422 U. S. 563, a person's liberty is also substantially affected by the stigma attached to treatment in a mental hospital.[3] But not every loss of liberty is governmental deprivation of liberty, and it is only the latter that invokes the Due Process Clause of the Fourteenth Amendment.

The appellees were committed under the following section of the Georgia Code:

"Authority to receive voluntary patients—

"(a) The superintendent of any facility may receive for observation and diagnosis any individual 18 years of age, or older, making application therefor, any individual under 18 years of age for whom such application is made by his parent or guardian and any person legally adjudged to be incompetent for whom such application is made by his guardian. If found to show evidence of mental illness and to be suitable for treatment, such person may be given care and treatment at such facility and such person may be detained by such facility for such period and under such conditions as may be authorized by law." Ga. Code § 88–503.1 (1975).

Clearly, if the appellees in this case were adults who had voluntarily chosen to commit themselves to a state mental hospital, they could not claim that the State had thereby deprived them of liberty in violation of the Fourteenth Amendment. Just as clearly, I think, children on whose

---

[3] The fact that such a stigma may be unjustified does not mean it does not exist. Nor does the fact that public reaction to past commitment may be less than the reaction to aberrant behavior detract from this assessment. The aberrant behavior may disappear, while the fact of past institutionalization lasts forever.

behalf their parents have invoked these voluntary procedures can make no such claim.

The Georgia statute recognizes the power of a party to act on behalf of another person under the voluntary commitment procedures in two situations: when the other person is a minor not over 17 years of age and the party is that person's parent or guardian, and when the other person has been "legally adjudged incompetent" and the party is that person's guardian. In both instances two conditions are present. First, the person being committed is presumptively incapable of making the voluntary commitment decision for himself. And second, the parent or guardian is presumed to be acting in that person's best interests.[4] In the case of guardians, these presumptions are grounded in statutes whose validity nobody has questioned in this case. Ga. Code § 49–201 (1978).[5] In the case of parents, the presumptions are grounded in a statutory embodiment of long-established principles of the common law.

Thus, the basic question in this case is whether the Constitution requires Georgia to ignore basic principles so long accepted by our society. For only if the State in this setting is constitutionally compelled always to intervene between parent and child can there be any question as to the constitutionally required extent of that intervention. I believe this basic question must be answered in the negative.[6]

---

[4] This is also true of a child removed from the control of his parents. For the juvenile court then has a duty to "secure for him care as nearly as possible equivalent to that which [his parents] should have given him." Ga. Code § 24A–101 (1978).

[5] "The power of the guardian over the person of his or her ward shall be the same as that of the parent over his or her child, the guardian standing in his or her place; and in like manner it shall be the duty of the guardian to protect and maintain, and, according to the circumstances of the ward, to educate him or her."

[6] Planned Parenthood of Central Missouri v. Danforth, 428 U. S. 52, was an entirely different case. The Court's opinion today discusses some of

Under our law, parents constantly make decisions for their minor children that deprive the children of liberty, and sometimes even of life itself. Yet surely the Fourteenth Amendment is not invoked when an informed parent decides upon major surgery for his child, even in a state hospital. I can perceive no·basic constitutional differences between commitment to a mental hospital and other parental decisions that result in a child's loss of liberty.

I realize, of course, that a parent's decision to commit his child to a state mental institution results in a far greater loss of liberty than does his decision to have an appendectomy performed upon the child in a state hospital. But if, contrary to my belief, this factual difference rises to the level of a constitutional difference, then I believe that the objective checks upon the parents' commitment decision, embodied in Georgia law and thoroughly discussed, *ante,* at 613–617, are more than constitutionally sufficient.

To be sure, the presumption that a parent is acting in the best interests of his child must be a rebuttable one, since certainly not all parents are actuated by the unselfish motive the law presumes. Some parents are simply unfit parents. But Georgia clearly provides that an unfit parent can be stripped of his parental authority under laws dealing with neglect and abuse of children.[7]

This is not an easy case. Issues involving the family and issues concerning mental illness are among the most difficult that courts have to face, involving as they often do serious problems of policy disguised as questions of constitutional

---

these differences, *ante,* at 604, but I think there is a more fundamental one. The *Danforth* case involved an expectant mother's right to decide upon an abortion—a personal substantive constitutional right. *Roe* v. *Wade,* 410 U. S. 113; *Doe* v. *Bolton,* 410 U. S. 179. By contrast, the appellees in this case had no substantive constitutional right not to be hospitalized for psychiatric treatment.

[7] See MR. JUSTICE BRENNAN's opinion, *post,* at 630–631, and n. 16.

law. But when a state legislature makes a reasonable definition of the age of minority, and creates a rebuttable presumption that in invoking the statutory procedures for voluntary commitment a parent is acting in the best interests of his minor child, I cannot believe that the Fourteenth Amendment is violated. This is not to say that in this area the Constitution compels a State to respect the traditional authority of a parent, as in the *Meyer* and *Pierce* cases. I believe, as in *Prince* v. *Massachusetts,* 321 U. S. 158, that the Constitution would tolerate intervention by the State.[8] But that is a far cry from holding that such intervention is constitutionally compelled.

For these reasons I concur in the judgment.

Mr. Justice Brennan, with whom Mr. Justice Marshall and Mr. Justice Stevens join, concurring in part and dissenting in part.

I agree with the Court that the commitment of juveniles to state mental hospitals by their parents or by state officials acting *in loco parentis* involves state action that impacts upon constitutionally protected interests and therefore must be accomplished through procedures consistent with the constitutional mandate of due process of law. I agree also that the District Court erred in interpreting the Due Process Clause to require preconfinement commitment hearings in all cases in which parents wish to hospitalize their children. I disagree, however, with the Court's decision to pretermit questions concerning the postadmission procedures due Georgia's institutionalized juveniles. While the question of the frequency of postadmission review hearings may properly be deferred, the

---

[8] The *Prince* case held that the State may constitutionally intervene in the parent-child relationship for the purpose of enforcing its child-labor law.

If the State intervened, its procedures would, of course, be subject to the limitations imposed by the Fourteenth Amendment.

right to at least one postadmission hearing can and should be affirmed now. I also disagree with the Court's conclusion concerning the procedures due juvenile wards of the State of Georgia. I believe that the Georgia statute is unconstitutional in that it fails to accord preconfinement hearings to juvenile wards of the State committed by the State acting *in loco parentis*.

## I

RIGHTS OF CHILDREN COMMITTED TO MENTAL INSTITUTIONS

Commitment to a mental institution necessarily entails a "massive curtailment of liberty," *Humphrey* v. *Cady,* 405 U. S. 504, 509 (1972), and inevitably affects "fundamental rights." *Baxstrom* v. *Herald,* 383 U. S. 107, 113 (1966). Persons incarcerated in mental hospitals are not only deprived of their physical liberty, they are also deprived of friends, family, and community. Institutionalized mental patients must live in unnatural surroundings under the continuous and detailed control of strangers. They are subject to intrusive treatment which, especially if unwarranted, may violate their right to bodily integrity. Such treatment modalities may include forced administration of psychotropic medication,[1] aversive conditioning,[2] convulsive therapy,[3] and even psychosurgery.[4] Furthermore, as the Court recognizes, see *ante,* at 600, persons confined in mental institutions are stigmatized as

---

[1] See *Winters* v. *Miller,* 446 F. 2d 65 (CA2), cert. denied, 404 U. S. 985 (1971); *Scott* v. *Plante,* 532 F. 2d 939 (CA3 1976); *Souder* v. *McGuire,* 423 F. Supp. 830 (MD Pa. 1976).

[2] See *Knecht* v. *Gillman,* 488 F. 2d 1136 (CA8 1973); *Mackey* v. *Procunier,* 477 F. 2d 877 (CA9 1973).

[3] See *Wyatt* v. *Hardin,* No. 3195-N (MD Ala., Feb. 28, June 26, and July 1, 1975); *Price* v. *Sheppard,* 307 Minn. 250, 239 N. W. 2d 905 (1976); *Nelson* v. *Hudspeth,* C. A. No. J75-40 (R) (SD Miss., May 16, 1977).

[4] See *Kaimowitz* v. *Michigan Dept. of Mental Health,* 42 U. S. L. W. 2063 (Cir. Ct. Wayne Cty., Mich., 1973).

sick and abnormal during confinement and, in some cases, even after release.[5]

Because of these considerations, our cases have made clear that commitment to a mental hospital "is a deprivation of liberty which the State cannot accomplish without due process of law." *O'Connor* v. *Donaldson*, 422 U. S. 563, 580 (1975) (BURGER, C. J., concurring). See, *e. g.*, *McNeil* v. *Director, Patuxent Institution*, 407 U. S. 245 (1972) (defective delinquent commitment following expiration of prison term); *Specht* v. *Patterson*, 386 U. S. 605 (1967) (sex offender commitment following criminal conviction); *Chaloner* v. *Sherman*, 242 U. S. 455, 461 (1917) (incompetence inquiry). In the absence of a voluntary, knowing, and intelligent waiver, adults facing commitment to mental institutions are entitled to full and fair adversary hearings in which the necessity for their commitment is established to the satisfaction of a neutral tribunal. At such hearings they must be accorded the right to "be present with counsel, have an opportunity to be heard, be confronted with witnesses against [them], have the right to cross-examine, and to offer evidence of [their] own." *Specht* v. *Patterson, supra*, at 610.

These principles also govern the commitment of children. "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights. See, *e. g.*, *Breed* v. *Jones*, 421 U. S. 519 (1975); *Goss* v. *Lopez*, 419 U. S. 565 (1975); *Tinker* v. *Des Moines School Dist.*, 393 U. S. 503 (1969); *In re Gault*, 387 U. S. 1 (1967)." *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S. 52, 74 (1976).

Indeed, it may well be argued that children are entitled to more protection than are adults. The consequences of an erroneous commitment decision are more tragic where chil-

---

[5] See generally Note, Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190, 1200 (1974).

dren are involved. Children, on the average, are confined for longer periods than are adults.[6] Moreover, childhood is a particularly vulnerable time of life [7] and children erroneously institutionalized during their formative years may bear the scars for the rest of their lives.[8] Furthermore, the provision of satisfactory institutionalized mental care for children generally requires a substantial financial commitment [9] that too often has not been forthcoming.[10] Decisions of the lower courts have chronicled the inadequacies of existing mental health facilities for children. See, e. g., *New York State Assn. for Retarded Children* v. *Rockefeller*, 357 F. Supp. 752, 756 (EDNY 1973) (conditions at Willowbrook School for the Mentally Retarded are "inhumane," involving "failure to protect the physical safety of [the] children," substantial personnel shortage, and "poor" and "hazardous" conditions); *Wyatt* v. *Stickney*, 344 F. Supp. 387, 391 (MD Ala. 1972), aff'd *sub nom. Wyatt* v. *Aderholt*, 503 F. 2d 1305 (CA5 1974) ("grossly substandard" conditions at Partlow School for the Mentally Retarded lead to "hazardous and deplorable inadequacies in the institution's operation").[11]

In addition, the chances of an erroneous commitment

---

[6] See Dept. of HEW, National Institute of Mental Health, Biometry Branch, Statistical Note 90, Utilization of Psychiatric Facilities by Persons 18 Years of Age, Table 8, p. 14 (July 1973).

[7] See J. Bowlby, Child Care and the Growth of Love 80 (1953); J. Horrocks, The Psychology of Adolescence 156 (1976); F. Elkin, Agents of Socialization in Children's Behavior 357, 360 (R. Bergman ed. 1968).

[8] See B. Flint, The Child and the Institution 14–15 (1966); H. Leland & D. Smith, Mental Retardation: Present and Future Perspectives 86 (1974); N. Hobbs, The Futures of Children 142–143 (1975).

[9] See Joint Commission on Mental Health of Children, Crisis in Child Mental Health: Challenge for the 1970's, p. 271 (1969).

[10] See R. Kugel & W. Wolfensberger, Changing Patterns in Residential Services for the Mentally Retarded 22 (1969).

[11] See also *Wheeler* v. *Glass*, 473 F. 2d 983 (CA7 1973); *Davis* v. *Watkins*, 384 F. Supp. 1196 (ND Ohio 1974); *Welsch* v. *Likins*, 373 F. Supp. 487 (Minn. 1974).

decision are particularly great where children are involved. Even under the best of circumstances psychiatric diagnosis and therapy decisions are fraught with uncertainties. See *O'Connor* v. *Donaldson, supra,* at 584 (BURGER, C. J., concurring). These uncertainties are aggravated when, as under the Georgia practice, the psychiatrist interviews the child during a period of abnormal stress in connection with the commitment, and without adequate time or opportunity to become acquainted with the patient.[12] These uncertainties may be further aggravated when economic and social class separate doctor and child, thereby frustrating the accurate diagnosis of pathology.[13]

These compounded uncertainties often lead to erroneous commitments since psychiatrists tend to err on the side of medical caution and therefore hospitalize patients for whom other dispositions would be more beneficial.[14] The National Institute of Mental Health recently found that only 36% of patients below age 20 who were confined at St. Elizabeths Hospital actually required such hospitalization.[15] Of particular relevance to this case, a Georgia study Commission on Mental Health Services for Children and Youth concluded that more than half of the State's institutionalized children were not in need of confinement if other forms of care were made available or used. Cited in *J. L.* v. *Parham,* 412 F. Supp. 112, 122 (MD Ga. 1976).

---

[12] See J. Simmons, Psychiatric Examination of Children 1, 6 (1974); Lourie & Rieger, Psychiatric and Psychological Examination of Children, in 2 American Handbook of Psychiatry 19 (2d ed. 1974).

[13] See Joint Commission on Mental Health of Children, *supra* n. 9, at 267.

[14] See T. Scheff, Being Mentally Ill: A Sociological Theory (1966); Ennis & Litwack, Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, 62 Calif. L. Rev. 693 (1974).

[15] See Dept. of HEW, National Institute of Mental Health, Biometry Branch, Statistical Note 115, Children and State Mental Hospitals 4 (Apr. 1975).

## II

RIGHTS OF CHILDREN COMMITTED BY THEIR PARENTS

### A

Notwithstanding all this, Georgia denies hearings to juveniles institutionalized at the behest of their parents. Georgia rationalizes this practice on the theory that parents act in their children's best interests and therefore may waive their children's due process rights. Children incarcerated because their parents wish them confined, Georgia contends, are really voluntary patients. I cannot accept this argument.

In our society, parental rights are limited by the legitimate rights and interests of their children. "Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves." *Prince* v. *Massachusetts,* 321 U. S. 158, 170 (1944). This principle is reflected in the variety of statutes and cases that authorize state intervention on behalf of neglected or abused children [16] and that, *inter alia,* curtail parental authority to alienate their children's property,[17] to withhold necessary medical treatment,[18] and to deny children exposure to ideas

---

[16] See generally S. Katz, When Parents Fail (1971); M. Midonick & D. Besharov, Children, Parents and the Courts: Juvenile Delinquency, Ungovernability, and Neglect (1972); Wald, State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards, 27 Stan. L. Rev. 985 (1975).

[17] See, *e. g., Martorell* v. *Ochoa,* 276 F. 99 (CA1 1921).

[18] See, *e. g., Jehovah's Witnesses* v. *King County Hospital,* 278 F. Supp. 488 (WD Wash. 1967), aff'd, 390 U. S. 598 (1968); *In re Sampson,* 65 Misc. 2d 658, 317 N. Y. S. 2d 641 (Fam. Ct. Ulster County, 1970), aff'd, 37 App. Div. 2d 668, 323 N. Y. S. 2d 253 (1971), aff'd, 29 N. Y. 2d 900, 278 N. E. 2d 918 (1972); *State* v. *Perricone,* 37 N. J. 463, 181 A. 2d 751 (1962). Similarly, more recent legal disputes involving the sterilization of children have led to the conclusion that parents are not permitted to authorize operations with such far-reaching consequences. See, *e. g., A. L.* v.

and experiences they may later need as independent and autonomous adults.[19]

This principle is also reflected in constitutional jurisprudence. Notions of parental authority and family autonomy cannot stand as absolute and invariable barriers to the assertion of constitutional rights by children. States, for example, may not condition a minor's right to secure an abortion on attaining her parents' consent since the right to an abortion is an important personal right and since disputes between parents and children on this question would fracture family autonomy. See *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S., at 75.

This case is governed by the rule of *Danforth.* The right to be free from wrongful incarceration, physical intrusion, and stigmatization has significance for the individual surely as great as the right to an abortion. Moreover, as in *Danforth,* the parent-child dispute at issue here cannot be characterized as involving only a routine child-rearing decision made within the context of an ongoing family relationship. Indeed, *Danforth* involved only a potential dispute between parent and child, whereas here a break in family autonomy has actually resulted in the parents' decision to surrender custody of their child to a state mental institution. In my view, a child who has been ousted from his family has even greater need for an independent advocate.

Additional considerations counsel against allowing parents unfettered power to institutionalize their children without

G. R. H., 163 Ind. App. 636, 325 N. E. 2d 501 (1975); *In re M. K. R.,* 515 S. W. 2d 467 (Mo. 1974); *Frazier* v. *Levi,* 440 S. W. 2d 393 (Tex. Civ. App. 1969).

[19] See *Commonwealth* v. *Renfrew,* 332 Mass. 492, 126 N. E. 2d 109 (1955); *Meyerkorth* v. *State,* 173 Neb. 889, 115 N. W. 2d 585 (1962), appeal dism'd, 372 U. S. 705 (1963); *In re Weberman,* 198 Misc. 1055, 100 N. Y. S. 2d 60 (Sup. Ct. 1950), aff'd, 278 App. Div. 656, 102 N. Y. S. 2d 418, aff'd, 302 N. Y. 855, 100 N. E. 2d 47, appeal dism'd, 342 U. S. 884 (1951).

cause or without any hearing to ascertain that cause. The presumption that parents act in their children's best interests, while applicable to most child-rearing decisions, is not applicable in the commitment context. Numerous studies reveal that parental decisions to institutionalize their children often are the results of dislocation in the family unrelated to the children's mental condition.[20] Moreover, even well-meaning parents lack the expertise necessary to evaluate the relative advantages and disadvantages of inpatient as opposed to outpatient psychiatric treatment. Parental decisions to waive hearings in which such questions could be explored, therefore, cannot be conclusively deemed either informed or intelligent. In these circumstances, I respectfully suggest, it ignores reality to assume blindly that parents act in their children's best interests when making commitment decisions and when waiving their children's due process rights.

### B

This does not mean States are obliged to treat children who are committed at the behest of their parents in precisely the same manner as other persons who are involuntarily committed. The demands of due process are flexible and the parental commitment decision carries with it practical implications that States may legitimately take into account. While as a general rule due process requires that commitment hearings precede involuntary hospitalization, when parents seek to hospitalize their children special considerations militate in favor of postponement of formal commitment proceedings and against mandatory adversary preconfinement commitment hearings.

---

[20] Murdock, Civil Rights of the Mentally Retarded: Some Critical Issues, 48 Notre Dame Law. 133, 138 (1972); Vogel & Bell, The Emotionally Disturbed Child as the Family Scapegoat, in a Modern Introduction to the Family 412 (1968).

First, the prospect of an adversary hearing prior to admission might deter parents from seeking needed medical attention for their children. Second, the hearings themselves might delay treatment of children whose home life has become impossible and who require some form of immediate state care. Furthermore, because adversary hearings at this juncture would necessarily involve direct challenges to parental authority, judgment, or veracity, preadmission hearings may well result in pitting the child and his advocate against the parents. This, in turn, might traumatize both parent and child and make the child's eventual return to his family more difficult.

Because of these special considerations, I believe that States may legitimately postpone formal commitment proceedings when parents seek inpatient psychiatric treatment for their children. Such children may be admitted, for a limited period, without prior hearing, so long as the admitting psychiatrist first interviews parent and child and concludes that short-term inpatient treatment would be appropriate.

Georgia's present admission procedures are reasonably consistent with these principles. See *ante,* at 613–616. To the extent the District Court invalidated this aspect of the Georgia juvenile commitment scheme and mandated preconfinement hearings in all cases, I agree with the Court that the District Court was in error.

## C

I do not believe, however, that the present Georgia juvenile commitment scheme is constitutional in its entirety. Although Georgia may postpone formal commitment hearings, when parents seek to commit their children, the State cannot dispense with such hearings altogether. Our cases make clear that, when protected interests are at stake, the "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews*

v. *Eldridge,* 424 U. S. 319, 333 (1976), quoting in part from *Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965). Whenever prior hearings are impracticable, States must provide reasonably prompt postdeprivation hearings. Compare *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.,* 419 U. S. 601 (1975), with *Mitchell* v. *W. T. Grant Co.,* 416 U. S. 600 (1974).

The informal postadmission procedures that Georgia now follows are simply not enough to qualify as hearings—let alone reasonably prompt hearings. The procedures lack all the traditional due process safeguards. Commitment decisions are made *ex parte.* Georgia's institutionalized juveniles are not informed of the reasons for their commitment; nor do they enjoy the right to be present at the commitment determination, the right to representation, the right to be heard, the right to be confronted with adverse witnesses, the right to cross-examine, or the right to offer evidence of their own. By any standard of due process, these procedures are deficient. See *Wolff* v. *McDonnell,* 418 U. S. 539 (1974); *Morrissey* v. *Brewer,* 408 U. S. 471 (1972); *McNeil* v. *Director, Patuxent Institution,* 407 U. S. 245 (1972); *Specht* v. *Patterson,* 386 U. S., at 610. See also *Goldberg* v. *Kelly,* 397 U. S. 254, 269–271 (1970). I cannot understand why the Court pretermits condemnation of these *ex parte* procedures which operate to deny Georgia's institutionalized juveniles even "some form of hearing," *Mathews* v. *Eldridge, supra,* at 333, before they are condemned to suffer the rigors of long-term institutional confinement.[21]

The special considerations that militate against preadmis-

---

[21] The National Institute of Mental Health has reported: "[T]housands upon thousands of elderly patients now confined on the back wards of . . . state [mental] institutions were first admitted as children thirty, forty, and even fifty years ago. A recent report from one state estimates that one in every four children admitted to its mental hospitals 'can anticipate being permanently hospitalized for the next 50 years of their lives.'" Joint Commission on Mental Health of Children, *supra* n. 9, at 5–6.

sion commitment hearings when parents seek to hospitalize their children do not militate against reasonably prompt postadmission commitment hearings. In the first place, postadmission hearings would not delay the commencement of needed treatment. Children could be cared for by the State pending the disposition decision.

Second, the interest in avoiding family discord would be less significant at this stage since the family autonomy already will have been fractured by the institutionalization of the child. In any event, postadmission hearings are unlikely to disrupt family relationships. At later hearings, the case for and against commitment would be based upon the observations of the hospital staff and the judgments of the staff psychiatrists, rather than upon parental observations and recommendations. The doctors urging commitment, and not the parents, would stand as the child's adversaries. As a consequence, postadmission commitment hearings are unlikely to involve direct challenges to parental authority, judgment, or veracity. To defend the child, the child's advocate need not dispute the parents' original decision to seek medical treatment for their child, or even, for that matter, their observations concerning the child's behavior. The advocate need only argue, for example, that the child had sufficiently improved during his hospital stay to warrant outpatient treatment or outright discharge. Conflict between doctor and advocate on this question is unlikely to lead to family discord.

As a consequence, the prospect of a postadmission hearing is unlikely to deter parents from seeking medical attention for their children and the hearing itself is unlikely so to traumatize parent and child as to make the child's eventual return to the family impracticable.

Nor would postadmission hearings defeat the primary purpose of the state juvenile mental health enterprise. Under the present juvenile commitment scheme, Georgia parents do not enjoy absolute discretion to commit their

children to public mental hospitals. See *ante,* at 614–615. Superintendents of state facilities may not accept children for long-term treatment unless they first determine that the children are mentally ill and will likely benefit from long-term hospital care. .See *ibid.* If the superintendent determines either condition is unmet, the child must be released or refused admission, regardless of the parents' desires. See *ibid.* No legitimate state interest would suffer if the superintendent's determinations were reached through fair proceedings with due consideration of fairly presented opposing viewpoints rather than through the present practice of secret, *ex parte* deliberations.[22]

Nor can the good faith and good intentions of Georgia's psychiatrists and social workers, adverted to by the Court, see *ante,* at 615–616, excuse Georgia's *ex parte* procedures. Georgia's admitting psychiatrists, like the school disciplinarians described in *Goss* v. *Lopez,* 419 U. S. 565 (1975), "although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed." *Id.,* at 580. See App. 188–190, testimony of Dr. Messinger. Here, as in *Goss,* the "risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the ... process. ... '[F]airness can rarely be obtained by secret, one-sided determination

---

[22] Indeed, postadmission hearings may well advance the purposes of the state enterprise. First, hearings will promote accuracy and ensure that the superintendent diverts children who do not require hospitalization to more appropriate programs. Second, the hearings themselves may prove therapeutic. Children who feel that they have received a fair hearing may be more likely to accept the legitimacy of their confinement, acknowledge their illness, and cooperate with those attempting to give treatment. This, in turn, would remove a significant impediment to successful therapy. See Katz, The Right to Treatment—An Enchanting Legal Fiction?, 36 U. Chi. L. Rev. 755, 768–769 (1969); *O'Connor* v. *Donaldson,* 422 U. S. 563, 579 (1975) (BURGER, C. J., concurring).

of facts decisive of rights. . . .' 'Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.' " *Goss* v. *Lopez, supra,* at 580, quoting in part from *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 170, 171–172 (1951) (Frankfurter, J., concurring).

## III

RIGHTS OF CHILDREN COMMITTED BY THEIR STATE GUARDIANS

Georgia does not accord prior hearings to juvenile wards of the State of Georgia committed by state social workers acting *in loco parentis.* The Court dismisses a challenge to this practice on the grounds that state social workers are obliged by statute to act in the children's best interest. See *ante,* at 619.

I find this reasoning particularly unpersuasive. With equal logic, it could be argued that criminal trials are unnecessary since prosecutors are not supposed to prosecute innocent persons.

To my mind, there is no justification for denying children committed by their social workers the prior hearings that the Constitution typically requires. In the first place, such children cannot be said to have waived their rights to a prior hearing simply because their social workers wished them to be confined. The rule that parents speak for their children, even if it were applicable in the commitment context, cannot be transmuted into a rule that state social workers speak for their minor clients. The rule in favor of deference to parental authority is designed to shield parental control of child rearing from state interference. See *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535 (1925). The rule cannot be invoked in defense of unfettered state control of child rearing or to immunize from review the decisions of state social work-

ers. The social worker-child relationship is not deserving of the special protection and deference accorded to the parent-child relationship, and state officials acting *in loco parentis* cannot be equated with parents. See *O'Connor* v. *Donaldson,* 422 U. S. 563 (1975); *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972).

Second, the special considerations that justify postponement of formal commitment proceedings whenever parents seek to hospitalize their children are absent when the children are wards of the State and are being committed upon the recommendations of their social workers. The prospect of pre-admission hearings is not likely to deter state social workers from discharging their duties and securing psychiatric attention for their disturbed clients. Moreover, since the children will already be in some form of state custody as wards of the State, prehospitalization hearings will not prevent needy children from receiving state care during the pendency of the commitment proceedings. Finally, hearings in which the decisions of state social workers are reviewed by other state officials are not likely to traumatize the children or to hinder their eventual recovery.

For these reasons, I believe that, in the absence of exigent circumstances, juveniles committed upon the recommendation of their social workers are entitled to preadmission commitment hearings. As a consequence,. I would hold Georgia's present practice of denying these juveniles prior hearings unconstitutional.

## IV

Children incarcerated in public mental institutions are constitutionally entitled to a fair opportunity to contest the legitimacy of their confinement. They are entitled to some champion who can speak on their behalf and who stands ready to oppose a wrongful commitment. Georgia should not be permitted to deny that opportunity and that champion simply because the children's parents or guardians wish them

to be confined without a hearing. The risk of erroneous commitment is simply too great unless there is some form of adversary review. And fairness demands that children abandoned by their supposed protectors to the rigors of institutional confinement be given the help of some separate voice.