OPINION OF THE COURT
Joseph D. Mintz, J.
Petitioner moves by order to show cause for a judgment pursuant to CPLR article 78:
(1) directing respondents to offer competent proof that petitioner was cheating on a written examination given March 3,1982 at the Central Police Services Law Enforcement Training Academy (hereinafter the Academy);
(2) annulling as unlawful, arbitrary and capricious the dismissal of petitioner from the Academy;
(3) reinstating petitioner forthwith in the Academy; and
(4) such other relief as is just and proper.
Petitioner’s contentions involve an assertion that the petitioner’s dismissal from the Academy constituted a deprivation of liberty or property without due process of law. Implicit in the decision of this issue is the determination of three questions:
*131 First, whether petitioner’s dismissal from the Academy constituted a deprivation of a property or liberty interest; if so — second, the extent to which due process safeguards must be afforded petitioner; more specifically whether an evidentiary hearing must be afforded and what rights must be afforded in such a hearing; third, whether the Academy complied with whatever procedural due process safeguards are required.
The undisputed facts underlying the petition are as follows:
Petitioner is an Erie County Deputy Sheriff jail guard who received her permanent appointment in July, 1980. Under the collective bargaining agreement which governs Erie County Deputy Sheriffs, a Deputy Sheriff may be reassigned from the holding center to transportation only if the Deputy Sheriff meets a 16-week training course at the Academy. Petitioner enrolled in the training course and commenced study on February 3, 1982. On March 3, 1982, petitioner participated in an examination at the Academy. On March 4, 1982, petitioner was advised by respondent Stephen Pikul, Jr., that training instructors Timothy R. Lundquist and Arnold J. Di Scipio had observed petitioner cheating on the examination of March 3, 1982. At that time, petitioner was shown a copy of the instructors’ violation report; petitioner was asked to admit to the charges and to so designate on the violation report, which petitioner refused to do. Thereupon, petitioner was dismissed from the Academy, and returned to the Erie County Sheriff’s Department.
The initial question to be addressed is whether the dismissal of petitioner from the Academy constituted a deprivation of liberty or property so as to require the safeguards of due process. Respondents argue that petitioner “has not established a clear legal right to attend” the Academy. The absence of a “clear legal right” which is defined by the Supreme Court to be a constitutional or “statutory entitlement” in Board of Regents v Roth (408 US 564), tends to show the absence of any property interest sufficient to require due process safeguards. However, due process is required not only for the deprivation of property interests but also for the deprivation of liberty. Although *132 petitioner may have no clear right of attendance at the Academy, and thus no property interest of which she was deprived by her dismissal, she may have suffered a deprivation of liberty.
Liberty under the Fourteenth Amendment is more than just freedom from bodily restraint. It also includes the right of the individual to engage in any of the common occupations of life (Board of Regents v Roth, supra, p 572, citing Meyer v Nebraska, 262 US 390), and the right to be free of besmirchment of a person’s good name, reputation, honor or integrity (Board of Regents v Roth, supra, p 573, citing Wisconsin v Constantineau, 400 US 433). If petitioner’s dismissal from the Academy constituted a deprivation of the petitioner’s ability to engage in a particular occupation or resulted in the placing at stake her good name, reputation, honor or integrity, petitioner has been deprived of liberty and must be afforded due process.
If it were necessary to determine whether petitioner was barred from pursuing a career in the transportation division of the Sheriff’s Department, and whether such a bar is a deprivation of the ability to engage in a specific occupation, certain facts, which on the basis of the pleadings are disputed, would have to be determined. However, there is sufficient evidence of besmirchment of the petitioner’s character to constitute a deprivation of liberty, and need for a hearing on the former question is obviated.
The respondents’ act of dismissing petitioner from the Academy was attended by a significant amount of publicity. Where allegations which place an individual’s character in question have not been publicized except to the individual himself (Bishop v Wood, 426 US 341), or where the stigma is unaccompanied by a change of status (Paul v Davis, 424 US 693), there is no deprivation of liberty. On the other hand, where there has been a change in status and publication of the allegation that petitioner was dismissed for cheating, an allegation which undoubtedly places at stake petitioner’s name, reputation, honor and integrity, a deprivation of liberty is present.
Respondents’ papers create an inference that the publicity surrounding the dismissal may have been caused by petitioner alone. If this were the case, it would be difficult *133 to say that respondents had deprived petitioner of liberty; petitioner would alone carry the responsibility for an essential element of liberty deprivation. However, petitioner affirms that she did not initiate the media coverage, while respondents affirm that they did not initiate the coverage. Indeed, as best can be determined by the papers of the parties, it was not either party, but the Sheriff’s Department which initiated the publicity. Again, it is not clear whether the publicity which ensued is traceable through the Sheriff’s Department to petitioner or to respondents, as both notified the Sheriff’s Department; petitioner notified Chief Robert Ford and respondents notified Sheriff Kenneth Braun by letter of March 5, 1982. But it cannot be reasonably deduced from the articles themselves and the pleadings that petitioner is solely responsible. Furthermore, by respondents’ admissions, after the publicity had already been initiated, they did respond to further inquiries from the press. Thus, it would be unreasonable under the circumstances to rule petitioner solely responsible for the publicity. Moreover, although the publicity is a necessary element in showing a governmental stigmatization, it was not the publicity alone, even if enhanced by the petitioner herself, which created this stigma. Even if the respondents had no part in creating media publicity, they were responsible for the very act that initiated the threat to petitioner’s reputation. This is not a situation where the publicity can be carefully excised from the governmental action (cf. Owen v City of Independence, 445 US 622); here the publicity grew out of the stigmatizing action. And the concurrent effect deprived petitioner of liberty so as to mandate due process safeguards.
Before addressing the question of what level of safeguards are necessary pursuant to due process before petitioner could be dismissed for cheating, it should be noted that respondents’ internal procedures require a certain level of due process for Academy violations. Article XX of the respondents’ rules and regulations provides:
“XX PROCEDURE REGARDING ACADEMY VIOLATIONS
“1. A private meeting will be conducted with the student by his staff counselor concerning the violation.
*134 “2. A written report of the details of the violation and its final disposition will be placed in the student officer’s Academy personal file.
“3. Continual violations will result in a disciplinary hearing with the Central Police Services Director of Training. This type of action will result in the officer being sent back to his department to answer for his conduct.
“4. Depending upon the severity and/or the frequency of the violations, the student officer will be immediately dismissed from the Academy.”
In light of the finding that petitioner has been deprived of liberty interest, these procedures must be interpreted in a way that is consistent with due process, if possible, or else due process requires that they be stricken.
In order to determine what level of protection due process requires, a balancing of the several interests involved is required. Due process does not require that a full evidentiary hearing resembling a trial be had anytime a liberty or property interest is affected. However, there are occasions when such a hearing is required. (See, generally, Goss v Lopez, 419 US 565; Joint Anti-Fascist Committee v McGrath, 341 US 123.)
The level of procedural safeguards is determined by means of a weighing process developed by the Supreme Court in Mathews v Eldridge (424 US 319, 335). That test depends on three factors: “First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.”
Applying this test to the facts of this case obtains the following factors: First, the private interest involved entails the stigma of dismissal for cheating. Although this is not a life or death interest such as requires a full hearing prior to deprivation. (See Mathews v Eldridge, supra, vis-a-vis Goldberg v Kelly, 397 US 254.) An evidentiary hearing so as to allow petitioner to clear her name is quite *135 appropriate as regards such a property interest. Second, the procedure employed which generally involves the acceptance of a report of an instructor is very susceptible to error, particularly as regards the charge alleged: that petitioner cheated by looking at another student’s test paper. In addition, a full evidentiary hearing of an adversary nature is one which would likely be of great value in determining the validity of the allegations. Finally, since the penalty of dismissal is not often given for Academy offenses, the requirement of a full evidentiary hearing would not place any undue burden on the Academy. Therefore, the Mathews v Eldridge factors weigh quite heavily in favor of a requirement of a full adversary-type hearing.
This result is not inconsistent with recent Supreme Court cases entailing the due process requirement of a hearing, and is in accord with the lower court cases which require evidentiary hearings in similar situations. In those Supreme Court cases where a full evidentiary hearing was denied, to enforce the requirement of a hearing would be an undue burden upon the governmental body (Goss v Lopez, 419 US 565, supra, where the court instead required an informal proceeding before a public school could suspend a student for less than 10 days), or an evidentiary hearing involving counsel and cross-examination would not provide any better method of determination than that employed (Parham v J.R., 442 US 584, where child commitment proceedings initiated by the child’s parents were determined by a panel of mental health doctors, lawyers and other mental health experts, the court would not require an adversary-type hearing).
The Supreme Court’s opinion in Goss v Lopez (supra, p 584) is clear, however, that a formal hearing may be replaced by an informal give-and-take immediately following the notice of the charges and evidence in support of the charges only for short suspensions from school: “We should also make it clear that we have addressed ourselves solely to the short suspension, not exceeding 10 days. Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures.” This requirement of more formal procedures for expulsions is borne out in a myriad of lower court cases *136 involving expulsion from public schools and colleges (e.g., Dixon v Alabama State Bd. of Educ., 294 F2d 150, cert den 368 US 930; Tibbs v Board of Educ., 114 NJ Super 287, affd 59 NJ 506; Matter of Carey v Savino, 91 Misc 2d 50).
Critical to these procedures is adequate notice of the charges and a hearing of some sort. As regards the notice of the charges, the lower courts have required that they be in writing and be presented sufficiently in advance of any hearing to afford the student an opportunity to prepare a meaningful defense. In Matter of Carey v Savino (supra), the court by Justice Kuszynski imposed these two requirements on the school board and ruled that notice of a hearing to be held at 5:30 p.m. the following day was insufficient as a matter of law. Furthermore, the court ruled, the student must be given an opportunity to obtain counsel. There appears to be no sufficient reason to deviate from these standards.
As regards the hearing itself, the court in Dixon (supra, pp 158-159) established the following standards: “The nature of the hearing should vary depending upon the circumstances of the particular case * * * By its nature, a charge of misconduct, as opposed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of witnesses. In such circumstances, a hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required * * * Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college.” These standards were applied in Winnick v Manning (460 F2d 545, 550) where the court also commented on the role of cross-examination: “[I]f this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing. This was not a case, however, where the decision maker had to choose to believe either the accused or his accuser.” In that case, the student had admitted the behavior he was charged with, and so *137 cross-examination would have been futile. However, in the instant case, the decision maker would have to have been faced with the conflict of the credibility of the accusers and the credibility of petitioner, who denied the charges. This is precisely the instance where cross-examination is useful and necessary to a fair hearing.
Finally, there is the requirement, recognized in all cases found, of an impartial decision maker. This individual can be the principal or dean so long as no particular relationship to the evidence can be shown. (See, e.g., Winnick v Manning, supra.) There is no evidence, in this case, that respondent Pikul was anything but impartial.
In summary, this particular incident warranted the following procedure: (1) written notice of the charges with specificity as to the offense and the evidence tending to show the offense; (2) a hearing before an impartial decision maker with sufficient notice to allow for the retention and presence of counsel; (3) an opportunity for petitioner to present a detailed defense to the charges; (4) an opportunity for petitioner to cross-examine her accusers.
The third question to be addressed is whether respondents complied with these standards required in order to afford petitioner due process. Although their compliance with some of these requirements may be at issue, there appears to be no question that respondents did not afford petitioner sufficient notice of the hearing to allow her to obtain counsel. The only hearing, if any, provided her was on March 4, 19.82, and the incident occurred on March 3, 1982. Even if petitioner was notified immediately following the examination of the charges against her, this was not sufficient notice to her under the ruling of Matter of Carey v Savino (91 Misc 2d 50, supra). Therefore, a rehearing by respondents along the guidelines outlined above is necessary before petitioner can be dismissed. However, the graduation and certification of petitioner is stayed pending the rehearing and redetermination of the charges or the expiration of 60 days from the entry of a final order, whichever occurs first.