# Supreme Court of Texas

═══════════

No. 23-0697

═══════════

State of Texas; Office of the Attorney General of the
State of Texas; Texas Medical Board; Texas Health and Human
Services Commission; and Ken Paxton, in his official capacity as
Attorney General of the State of Texas,

*Appellants*,

v.

Lazaro Loe, individually and as next friend of Luna Loe, a minor;
Mary Moe and Matthew Moe, individually and as next friends of
Maeve Moe, a minor; Nora Noe, individually and as next friend of
Nathan Noe, a minor; Sarah Soe and Steven Soe, individually
and as next friends of Samantha Soe, a minor; Gina Goe,
individually and as next friend of Grayson Goe, a minor;
PFLAG, Inc.; Richard Ogden Roberts III, M.D.; David L. Paul,
M.D.; Patrick W. O'Malley, M.D.; and American Association of
Physicians for Human Rights, Inc. d/b/a GLMA: Health
Professionals Advancing LGBTQ Equality,

*Appellees*

═══════════

On Direct Appeal from the
201st District Court, Travis County, Texas

═══════════

JUSTICE LEHRMANN, dissenting.

At its core, this case presents a foundational issue: whether the State can usurp parental authority to follow a physician's advice regarding their own children's medical needs. The parents at issue are thoughtful, conscientious caretakers who are doing the best they can to deal with serious health conditions with which their children have been diagnosed. They certainly are not mistreating their children. To the contrary, they are facing this challenge with extraordinary courage, fortitude, and perseverance. The State's categorical statutory prohibition prevents these parents, and many others, from developing individualized treatment plans for their children in consultation with their physicians, even the children for whom treatment could be lifesaving. The law is not only cruel—it is unconstitutional.

The Court claims that its decision today does not deprive children diagnosed with gender dysphoria of appropriate treatment; it is simply answering the legal question before it. Yet, answering the question does just what the Court denies—it effectively forecloses all medical treatment options that are currently available to these children. And it does so under the guise that depriving parents of access to these treatments is no different than prohibiting parents from allowing their children to get tattoos. Of course, there is nothing remotely medically necessary about tattooing. Confusingly, the Court relies on cases unrelated to medical care to support its holding that the Legislature's authority to regulate the practice of medicine preempts the fundamental rights of parents. And though it admits that parental autonomy is a fundamental liberty interest encompassing the right to make medical

2

decisions for one's children, the Court nevertheless refuses to apply the constitutional scrutiny mandated for fundamental liberty interests.

While I agree that the Legislature has the general authority to regulate the practice of medicine, that authority is necessarily limited by the promises and protections of our Constitution; in fact, limiting the State's intrusion into private action is the very reason for the Bill of Rights. Thus, even when the Legislature exercises its delegated powers, it does so subject to the constitutional rights of citizens—not the other way around. If the Legislature's enactments infringe upon a fundamental liberty interest, those enactments must be subjected to the appropriate constitutional scrutiny.

Although this Court has enshrined a robust conceptualization of parental autonomy for many years, in the blink of an eye, the Court tosses that precedent aside today. Contrary to the Court's holding, the Due Course Clause protects parents' rights to make medical decisions for their children and, because S.B. 14 directly infringes upon that decision-making authority, it must withstand strict scrutiny. Such fundamental rights are not, as the Court erroneously concludes, subject to piecemeal dissection into subcategories that are treated differently for the purpose of constitutional review. Even if they were, this particular parental right—to make potentially life-saving medical decisions for one's children—certainly does not fall within the same category as tattooing, tobacco use, or even child labor.[1] Moreover, the

---

[1] If we are applying labels, in my view the appropriate label would be "potentially life-saving" treatment rather than "novel" treatment. The lack of

3

novelty of gender-affirming care makes it no less medically therapeutic when indicated than other cutting-edge medical interventions. Serious medical conditions often call for innovative and novel treatment plans that present risks—but not without good reason. When life is at stake, risky treatment may be the only real option.

The Court's one-sided concerns about potentially permanent effects associated with the prohibited treatments are particularly disconcerting given that the consequences of categorically denying children medical treatment for their gender dysphoria can be equally irreversible. Conservative estimates place suicidal ideation among transgender individuals at around 50%.[2] Further, a study of over 6,000 transgender individuals in the U.S. indicates that minors are among those who have the highest risk of suicide.[3] That gender dysphoria was not a diagnosis recognized by the American Psychiatric Association until 1980 does not mean that the condition did not previously exist. The idea that it is "inconceivable" that anyone ever questioned his or her gender identity until recently, as one of the concurrences argues,[4] is both naïve

---

certainty about how unenumerated rights would be categorized leads me to agree with JUSTICE YOUNG that this type of reasoning is "opaque," at best. *Ante* at 10 (Young, J., concurring).

[2] Sam Levin, *More than 50% of Trans and Non-Binary Youth in US Considered Suicide this Year, Survey Says*, THE GUARDIAN (Dec. 17, 2022), https://www.theguardian.com/us-news/2022/dec/16/us-trans-non-binary-youth-suicide-mental-health?CMP=share_btn_url.

[3] *See generally* Josephine Mak, et al., *Suicide Attempts Among a Cohort of Transgender and Gender Diverse People*, 59 AM. J. OF PREVENTIVE MED. 570 (2020).

[4] *Ante* at 9, 11 (Blacklock, J., concurring).

4

and callous.[5]  And regardless of when individuals became comfortable expressing these realities publicly, the condition is certainly no "fantasy"[6] for many very real children and their very real parents. Moreover, whether one's gender identity is a product of biology or influenced by modern-day environmental factors, or both, is beside the point.  Regardless of the cause, real people express real concerns regarding gender dysphoria in today's world.  The medical establishment has recognized this reality, and so should the judiciary.

To survive strict scrutiny, the law must be narrowly tailored to serve a compelling state interest.  The State of course has a compelling interest in protecting children from harm as a general matter—though, notably, the interest is undercut when the alleged harm is medical treatment that has been approved by the vast majority of the medical community.  In any event, one thing is crystal clear: S.B. 14 is far from narrowly tailored.  It does not even provide for an exception to the ban when the prohibited treatment is needed to save the life of the child or

[5] *See, e.g.*, Jennifer L. Levi & Kevin M. Barry, *Transgender Tropes & Constitutional Review*, 37 YALE L. & POL'Y REV. 589, 595 (2019) ("Although moral animus toward transgender people has existed in some quarters for quite some time, history teaches that respect for transgender people is a tradition far more deeply rooted, with 'individuals whom today we might call transgender[] . . . play[ing] prominent roles in many societies, including our own[,] . . . [f]rom prehistoric times to the present.'" (alteration in original) (citation omitted)); ROBERT BEACHY, GAY BERLIN: BIRTHPLACE OF A MODERN IDENTITY (Alfred A. Knopf, 2014) (discussing the significant transgender community in Weimar Republic-era Berlin); EMILY SKIDMORE, TRUE SEX: THE LIVES OF TRANS MEN AT THE TURN OF THE TWENTIETH CENTURY (NYU Press, 2017) (providing a historical inquiry into the existence and prevalence of transgender identity from the late 1800s through the early 1900s).

[6] *Ante* at 8 (Blacklock, J., concurring).

5

to prevent substantial injury to the child. Surely the right of parents to make medical decisions, in consultation with their physicians, regarding the welfare of their children is worthy of more constitutional protection than the Court recognizes today. Concerningly, the Court's opinion puts all parental decisions at risk of being overruled by the government. The Court's attempt to cabin its opinion to only this case makes its outcome-driven decision-making all the more transparent. Because the Court refuses to properly recognize this core right, I am compelled to respectfully express my dissent.

## I. Background

### A. S.B. 14 Is a Hatchet, Not a Scalpel.

In passing S.B. 14, the Legislature articulated concerns regarding medical treatments aimed at addressing diagnoses of gender dysphoria in children—concerns that I take very seriously. Indeed, the leading medical associations in this field do not recommend surgical intervention before adulthood. Without a doubt, the removal of a young child's genitalia is something that neither the conventional medical community nor conscientious parents would condone. Moreover, medical experts do not recommend that *any* medical intervention, including the prescription of puberty blockers and hormones, be undertaken before the onset of puberty. Legislation that would narrowly prohibit such widely disfavored treatment is something that I believe could survive constitutional challenge. But that is not what S.B. 14 does. It does not simply take measures off the table that medical science has shown are, on balance, so risky and permanent that they should not be utilized. Rather, it prohibits all medical intervention for

6

gender dysphoria, across the board, no matter the age or emotional condition of the child.

The duty of a governing body to protect children's health and wellness does not supplant the duty of a fit parent to fulfill this responsibility.[7] In the first instance, parents have the responsibility to ensure that their children are safe and cared for. Parents have both a right and a duty to provide their children with sound, medically informed treatment. *See* TEX. FAM. CODE § 151.001(a)(3) (enumerating a parent's duty to "provid[e] the child with clothing, food, shelter, medical and dental care, and education"). However, S.B. 14 effectively bars parents from fulfilling that duty when, in consultation with their physicians, they decide that gender-affirming care is the best, perhaps even lifesaving, treatment to address their child's needs.

Indeed, S.B. 14 is a broad-sweeping law that prohibits doctors from treating patients according to their individual needs. It does not distinguish between appropriate and inappropriate medical intervention. Because of S.B. 14, doctors are bound to treat the medical needs of a nine-year-old expressing confused feelings about gender

---

[7] As JUSTICE YOUNG'S concurrence recognizes, parents have the autonomy "to conduct their affairs without needing permission from the majoritarian political process." *Ante* at 3 (Young, J., concurring). This is particularly true here, where the decisions of these parents are aimed solely at their own children—they are in no way directed at, and have no bearing on, other families. Notwithstanding any implication to the contrary, no one is remotely suggesting that the government should be able to force parents to consent to transgender therapy against their will. *See ante* at 9 n.10 (Blacklock, J., concurring). Rather, the reverse is true—a legislative majority is forcing their views on these families. And in the process, they are blocking the ability of these parents to use their best judgment to protect their children.

7

identity as identical to those of a seventeen-year-old struggling with suicidal ideation resulting from untreated gender dysphoria. Where it ought to have utilized the proverbial scalpel, the Legislature instead employed a hatchet, forgoing measured policy predicated on a well-documented medical consensus in favor of a crude and politically expedient categorical prohibition. In so doing, the Legislature supersedes the autonomy of parents whose children have been diagnosed with gender dysphoria under its authority to regulate medicine—no longer can parents rely on their physicians to help them develop sound, medical treatment plans to address their children's specific needs.

Concerningly, the Court acquiesces today. Despite the Court's so-called recognition of fundamental parental rights, it fails to articulate precisely why or how it distinguishes between the parental decisions that are constitutionally protected and those that are not. The Court's "parental rights for me but not for thee" approach has no objective criteria and renders parents entirely without guidance on whether their parental liberty will be meaningfully protected. The Court's opinion thus puts all parental rights in jeopardy.

**B.  The Experiences of Each Plaintiff Are Essential to this Case.**

While all the minor plaintiffs have been diagnosed with gender dysphoria, they are different ages, they are in different stages of their pubertal development, and their medical treatments at the time they filed suit ranged from psychotherapy alone to hormonal therapy. The varying circumstances and challenges faced by each plaintiff, glossed

over by the Court, directly undercut the State's purported justifications for a mandate that their medical needs be treated identically.

Plaintiffs Sarah and Steven Soe are the parents of fifteen-year-old Samantha Soe. When Samantha was thirteen, Sarah and Steven took Samantha to a pediatric endocrinologist who diagnosed gender dysphoria. After their doctor informed them of the risks and benefits of available treatment, Sarah and Steven decided to do additional research. They read medical literature and spoke with several other doctors. Eventually, after receiving multiple opinions offering similar advice, Sarah and Steven determined to proceed with puberty blockers. With medication, Samantha's mental health improved significantly. Being forced to stop this medication after the enactment of S.B. 14 has left these parents with unsatisfactory options: to move out of Texas permanently, to live apart from their child until Samantha turns eighteen, or to default on their obligation to provide Samantha with treatment that has improved her well-being.

Plaintiff Nora Noe is the mother of sixteen-year-old Nathan Noe. Before starting the medical care recommended by his physician, Nathan suffered from severe anxiety and had symptoms of obsessive–compulsive disorder. Though Nathan was a happy child, Nora noticed a dramatic shift around the age of eleven. Nathan became withdrawn and suffered in school to the point that Nora decided to homeschool. The onset of puberty was so distressing that Nathan became withdrawn and depressed. A few months later, Nathan was diagnosed with gender dysphoria and began seeing a therapist specializing in that condition. Nathan began taking testosterone in

9

November 2021. Even though Nathan's condition improved with this treatment, the news of S.B. 14 led to a cancellation of the treatment and has presented Nora and her husband with a difficult decision: whether to leave Texas entirely or to fail to continue to provide Nathan with medical treatment that has demonstrably helped him.

Plaintiff Gina Goe is the mother of fifteen-year-old Grayson Goe. Grayson experienced severe emotional distress for many years, leading to several incidents of self-harm that required emergency medical care. In 2020, Gina took Grayson to see an adolescent-medicine doctor who ultimately diagnosed him with gender dysphoria. At the age of fifteen, Grayson was evaluated for hormone therapy and, after the family's comprehensive review of the possible side effects and extensive discussions with their doctor, Gina determined it was in Grayson's best interest to begin the recommended treatment plan. Since the start of treatment, Gina has noticed a significant, positive change in Grayson's demeanor and mental health. Unfortunately, this treatment is no longer available to this family because of S.B. 14.

Plaintiff Lazaro Loe is the father of twelve-year-old Luna Loe. Luna expressed a female gender identity to Lazaro at a very early age. Luna has seen a child psychologist since the age of six and has been diagnosed with gender dysphoria. When Luna began to experience puberty, the psychologist recommended seeing an endocrinologist, who determined puberty blockers were a medically appropriate treatment. After consultation with the doctor about benefits and side effects, the Loes determined collectively that treatment was the proper decision. The Loes state that these medications have had a positive impact on

Luna's life. They allege that S.B. 14's prohibition of the medication Luna has been receiving for over a year will eliminate the treatment that has allowed Luna to thrive and may require the family to leave the only state Luna has ever called home.

Plaintiffs Matthew and Mary Moe are the parents of nine-year-old Maeve Moe. Maeve expressed an understanding of a female gender identity very early. When Maeve was six, the Moes saw a doctor who diagnosed Maeve with gender dysphoria and recommended follow-up visits every year before puberty. At the time suit was filed, the Moes' doctor had informed them that Maeve may begin puberty within the next several months. Following extensive discussions with their doctors, and amongst themselves, Matthew and Mary have decided that when puberty starts, puberty blockers may be necessary for Maeve to remain a healthy child. However, the threat of Maeve's recommended medical treatment being prohibited by S.B. 14, which is now a reality, led Mary to temporarily move her children out of state.

## C. S.B. 14 Contradicts Accepted Medical Community Standards.

The requirements of S.B. 14 directly contradict well-established industry standards of practice. Gender dysphoria is understood to refer to the distress caused by the incongruence between one's experienced or expressed gender and one's assigned biological sex. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th

11

ed. 2022).[8] This diagnosis has been the subject of much research, and the results of that research have provided organizations like the American Medical Association and the American Pediatric Association with a clinical basis to issue guidance to doctors.

Clinical studies indicate that gender-affirming care, provided to carefully evaluated patients who meet diagnostic criteria, can alleviate clinically significant distress and lead to significant improvements in mental health.[9] The American Medical Association has endorsed guidelines established by the World Professional Association for Transgender Health (the WPATH Guidelines) for the treatment of gender dysphoria.[10] The drafting committee that prepared these

_____

[8] The DSM is the "universal diagnostic system used in diagnosing mental health disorders in the United States and much of the rest of the world." *Tex. St. Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 31 (Tex. 2017).

[9] *See generally* Simona Martin et al., *Criminalization of Gender-Affirming Care—Interfering with Essential Treatment for Transgender Children and Adolescents*, 385 NEW ENG. J. MED. 579 (2021) (providing an overview of the scientific basis underlying gender-affirming care and its demonstrated effectiveness in "alleviating gender dysphoria").

[10] The WPATH Guidelines for the treatment of gender dysphoria in adolescents are summarized as follows:

1. A robust diagnostic assessment is made by a provider who is licensed by their statutory body and holds masters or equivalent in a relevant clinical field, has experience and received theoretical and evidence-based training in child, teen, and family mental health, and has expertise and training in several other relevant disorders and neurodevelopmental areas.
   a. Before developing a treatment plan, the provider should conduct a "comprehensive biopsychosocial assessment" of the patient.

guidelines included experts in the fields of endocrinology, pediatrics, and psychiatry. The deliberative process, which involved five years of

2. The guidelines recommend *only non-medical intervention* for prepubertal children.
    a. The guidelines provide for mental health care for the patient and family, but no medical interventions.
3. Under certain circumstances, the guidelines allow medical intervention for adolescents with gender dysphoria.
    a. Before medical intervention may be prescribed, there are several conditions that a qualified provider must determine are met:
        i. The adolescent patient meets the diagnostic criteria of gender incongruence according to the WHO's International Classification of Diseases or other taxonomy.
        ii. The adolescent has demonstrated a sustained and marked pattern of gender nonconformity or gender dysphoria.
        iii. The adolescent has demonstrated the emotional and cognitive maturity required to provide informed consent for treatment.
        iv. Any coexisting psychological, medical, or social problems that could interfere with diagnosis, treatment, or the adolescent's ability to consent have been addressed.
        v. The adolescent has been informed of the reproductive effects of treatment in the context of their stage in pubertal development and discussed fertility preservation options.
        vi. The adolescent has reached Tanner Stage 2 of puberty.

E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version* 8, 23 INT. J. TRANSGENDER HEALTH S48 tbl.12 (2022).

The Endocrine Society endorses similar criteria, with the additional requirements that a pediatric endocrinologist agree with the indication for treatment, confirm that the patient has started puberty, and confirm that there are no medical contraindications. Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869, 3878 tbl.5 (2017), https://academic.oup.com/jcem/article/102/11/3869/4157558.

thoughtful study, comment, and debate and over 119 authors, was robust and thorough.[11]

As *amici* point out, the guidelines are structured to address the same concerns articulated by the State—concerns that I share. WPATH undertook a nineteen-step, five-year drafting, comment, and review process, the same approach taken by the American Medical Association in other areas of clinical research and recommendation. This process resulted in a treatment model (summarized in note 10, *supra*) that is comprehensive and conservative in its approach. It does not recommend that any medical intervention, including prescription of puberty blockers, be undertaken until the detailed criteria have been satisfied.

The widely accepted view in the professional medical community, including that of the American Pediatric Association, is that gender-affirming care is the appropriate treatment for gender dysphoria in some cases.[12] Empirical data shows that this care greatly reduces the negative physical and mental health consequences that result when gender dysphoria is untreated.[13] In line with this data, the American Psychological Association has also issued guidelines for the treatment of gender dysphoria that recommend gender-affirming care be provided

---

[11] Coleman, *supra* note 10, at S247–51.

[12] *See* Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, AM. ACAD. OF PEDIATRICS 5–18 (2018); Br. of Am. Acad. of Pediatrics et al. as Amici Curiae Supporting Plaintiffs, at 8–22.

[13] Christal Achille et al., *Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results*, 8 INT'L J. PEDIATRIC ENDOCRINOLOGY 1–5 (2020), https://pubmed.ncbi.nlm.nih.gov/32368216.

when medically indicated.[14]  The official treatment recommendations of the American Academy of Pediatrics also align with this research.[15]

The guidelines for treatment of adolescents with gender dysphoria were the product of the same drafting, comment, and review process that *amici* organizations use for other clinical practice guides.[16] The Endocrine Society followed the Grading of Recommendations Assessment, Development, and Evaluation (GRADE) system, which imposes internationally recognized evidentiary requirements.[17]  The assessment was then reviewed, re-reviewed, and reviewed again by multiple, independent groups of professionals.[18]  Tellingly, the State's own expert witness acknowledged the overwhelming majority view of the medical community, describing his contrary position as "essentially me versus the entire medical establishment."[19]

---

[14] Am. Psychological Ass'n, *Guidelines for Psychological Practice With Transgender and Gender Nonconforming People*, 70(9) AMERICAN PSYCHOLOGIST 832, 862 (2015).

[15] Rafferty, *supra* note 12, at 5.

[16] *See* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guide*, 102(11) J. CLINICAL ENDOCRINOLOGY & METABOLISM 3872–73 (Nov. 2017) (providing a high-level overview of its methodology).

[17] *See* Gordon Guyatt et al., *GRADE guidelines: 1. Introduction— GRADE evidence profiles and summary of findings tables*, 64 J. CLINICAL EPIDEMIOLOGY 383 (2011).

[18] For more information on the methodological rigor of the guidelines, *see* Amicus Br. of Am. Acad. of Pediatrics et al., at 16.

[19] The Court brushes off Dr. Cantor's plain words: "[I]t was essentially me versus the entire medical establishment . . . ."  More concerningly, one of

## II. Discussion

Today the Court boldly pronounces that S.B. 14 is not subject to strict scrutiny; it is thus constitutional if any articulated rational basis can justify it. *Ante* at 25–26. The Court relies on the fact that the State has the power to regulate the practice of medicine and holds that such regulations do not implicate parental autonomy because the right extends "only to those medical treatments that are legally available." *Id.* at 17. The legal analysis is circular at best. Under the Court's rationale, the Legislature's prohibition is subject to only a rational basis review because the treatment is unlawful—but the treatment is unlawful only because the Legislature has prohibited it. The unacceptable result is that the prohibition is necessarily insulated from meaningful constitutional scrutiny.

Recognizing the far-reaching implications of this illogical assessment, the Court clumsily attempts to cabin it. Unfortunately, it does so with a remarkable opacity. Specifically, the Court holds that "[S.B. 14] merely restricts the availability of new treatments with which medical providers may treat children diagnosed with a newly defined medical condition, gender dysphoria." *Id.* at 25. But it provides absolutely no guidance for Texans on what the Constitution does or does not allow, noting only that the novelty of the regulated conduct is a factor to consider when determining the level of constitutional scrutiny that applies. The Court fails to acknowledge the unfortunate reality

---

the concurrences seems to dismiss the entire "medical establishment," including the American Medical Association, as being composed of elitist bureaucrats unconcerned with upholding their Hippocratic Oath. *See ante* at 5–6 (Blacklock, J., concurring). I respectfully disagree.

16

that relatively new medical procedures and treatments are often the only options available to loving parents who are desperately seeking to help their children.

Based on the Court's amorphous reasoning, neither the State nor Texans are given clarity beyond a vague sense that there may be some restrictions that would be protected by strict scrutiny. The Court's opinion *may* allow the Legislature to prohibit children from receiving vaccines, or it may not. The Court's opinion *may* allow the Legislature to ban homeschooling, or it may not. The Court's objection to a consistent and predictable standard of scrutiny that is applied regardless of whether it agrees with the parental decision at issue is concerning. Surely, whether a parent's decision will be constitutionally protected does not depend on whether the Court agrees with that decision on personal or policy grounds. Such a conception of constitutional rights does a tremendous disservice to our Constitution.

## A. Parents Have a Fundamental Right to Make Decisions Concerning the Care, Custody, and Control of Their Children.

Parental rights and liberties have long been understood as fundamental and, though not enumerated, constitutionally protected. The Court today does not refute the maxim that our Due Course Clause protects unenumerated substantive rights, nor could it. *See Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69, 87 (Tex. 2015) ("Given the temporal legal context, Section 19's substantive due course provisions undoubtedly were intended to bear at least some burden for protecting individual rights that the United States Supreme Court determined were not protected by the federal Constitution. That burden has been

17

recognized in various decisions of Texas courts for over one hundred and twenty-five years.").

This Court has been steadfast in its recognition that the Constitution "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *In re C.J.C.*, 603 S.W.3d 804, 811 (Tex. 2020) (citing *Troxel v. Granville*, 530 U.S. 57, 66 (2000)). In *Troxel*, even the U.S. Supreme Court justices who would not root this right in substantive-due-process jurisprudence nevertheless recognized a fundamental right of parents to direct the upbringing of their children. *Id.* at 812 (citing *Troxel*, 530 U.S. at 80 (Thomas, J., concurring); *id.* at 91 (Scalia, J., dissenting) (noting that the right "is among the 'unalienable Rights' with which the Declaration of Independence proclaims 'all men . . . are endowed by their Creator'" and "among the 'othe[r] [rights] retained by the people' which the Ninth Amendment says the Constitution's enumeration of rights 'shall not be construed to deny or disparage'"); *id.* at 95 (Kennedy, J., dissenting) ("As our case law has developed, the custodial parent has a constitutional right to determine, without undue interference by the state, how best to raise, nurture, and educate the child.")).[20]

The Court today defines the contours of constitutional protection for fundamental parental rights to essentially encompass only those state actions that seek to irrevocably sever the parent–child relationship

---

[20] I agree with JUSTICE YOUNG'S observation that sometimes an unenumerated right "is *so* fundamental to our legal tradition and culture that reducing it to writing may never even have occurred to the drafters" and that "[p]arental authority" is "part of the background assumptions of the law." *Ante* at 5 (Young, J., concurring).

or that entirely prevent parents from making decisions at all. *See ante* at 19 ("Certainly, then, when the State seeks to sever the parent–child relationship, those proceedings must be 'strictly scrutinized.'"); *see also id.* at 25 ("[S.B. 14] merely restricts the availability of new treatments with which medical providers may treat children diagnosed with a newly defined medical condition, gender dysphoria."). However, this Court has never viewed the scope of parental liberty so narrowly. To the contrary, the Court has consistently recognized the presumption that it is for the parents, and not the State, to guide the raising and caretaking of their child. *Byrne v. Love*, 14 Tex. 81, 91 (1855) ("There is no doubt that a guardian, and especially a father acting as guardian by nature, has very ample authority in the control, management, rearing, and education of his children . . . ."); *Legate v. Legate*, 28 S.W. 281, 282 (Tex. 1894) ("[The State] recognizes the fact that the interest of the child and of society is best promoted by leaving its education and maintenance during minority to the promptings of paternal affection, untrammeled by the surveillance of government . . . .").

The U.S. Supreme Court also recognizes a broadly construed "fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66. Not only has that Court taken such an approach for over a century, but this Court has consistently adopted and followed its guidance.[21]

---

[21] This Court has repeatedly modeled its analysis on the U.S. Supreme Court's articulation of parental rights. *See, e.g.*, *C.J.C.*, 603 S.W.3d at 811–12; *Miller v. HCA, Inc.*, 118 S.W.3d 758, 766 (Tex. 2003) (citing *Parham v. J.R.*, 442 U.S. 584, 602 (1979)); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

In *Pierce v. Society of Sisters*, the Supreme Court was asked to consider the constitutionality of a state law that prohibited children of certain ages from attending private or parochial schools. 268 U.S. 510, 532 (1925). The law's challengers suggested that the requirement that children attend public school "conflicts with the rights of parents to choose schools where their children will receive appropriate mental and religious training." *Id.* Though it was undisputed that the State had the power to reasonably regulate all schools and to require that "all children attend some school" and be taught "certain studies plainly essential to good citizenship," *id.* at 534, the Supreme Court struck the law down. The Court held that it was "entirely plain that the [statute] unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Id.* at 534–35. The Court went on to explain: "The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* at 535. Despite the states' constitutional authority to regulate education, and the fact that the challenged law merely limited the *type* of education available, the Court recognized a "fundamental theory of liberty" infringed by such legislative overreach. *Id.*

Of course, as the Court correctly observes today, the decision-making power of parents is not boundless. This is not remarkable—no rights, not even enumerated ones, are absolute. Parents have not only the autonomy, but the serious legal obligation, to make sure that their children are cared for properly. It follows, then,

20

that the State may supersede parental action when that action subjects their children to harm. However, in no other context has this Court allowed the State's interests to supersede a fundamental right subject only to a rational-basis review. This analysis has no support in precedent, and it renders "parental autonomy" illusory. This is especially true here, where the parental conduct at issue is based upon medically accepted advice from trusted physicians.

From the unexceptional premise that "parental control and authority have never been understood as constitutionally mandated absolutes," the Court makes a logically unsupported leap to the conclusion that strict scrutiny is not required. *Ante* at 20. To the contrary, the Texas Constitution does not permit the State to infringe upon the fundamental rights of parents simply because it believes a "better decision" could be made. *In re Mays–Hooper*, 189 S.W.3d 777, 778 (Tex. 2006); *see also In re A.M.*, 630 S.W.3d 25, 25 (Tex. 2019) (Blacklock, J., concurring in denial of petition for review) (noting that "this natural parental right [is] a basic civil right of man and far more precious than property rights"); *Parham v. J.R.*, 442 U.S. 584, 603 (1979) ("Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state."). Rather, the right is "not absolute" in the sense that "the State may legitimately interfere with family autonomy" in limited circumstances, such as "to protect children from genuine abuse and neglect by parents who are unfit to discharge the 'high duty' of 'broad parental authority over minor children.'" *A.M.*, 630 S.W.3d at 25

21

(quoting *Parham*, 442 U.S. at 602). That the right is not absolute in no way logically limits the breadth of that right, which this Court has always recognized.

**B.    "Care, Custody, and Control" Encompasses Medical Decision-Making.**

As certain fundamental rights and liberty interests are undoubtedly protected by the Due Course Clause, the next question is whether they include a parent's right to make medical decisions for their children's welfare. In short, they do.

Both the U.S. Supreme Court and this Court have long recognized that the right of parents to make decisions regarding the health and well-being of their children is among the most fundamental of rights. This right, encompassing the ability—and, indeed, the obligation—to seek and receive recommended medical treatments when one's child is in need, has ubiquitously been considered fundamental to our notions of ordered liberty. The right is not conditioned on whether the medical treatment sought is new, controversial, popular, or even effective, and it does not inherently give way to countervailing interests. While such interests exist, such as the authority of the State to regulate the practice of medicine, those interests do not alter the scope of the constitutional right at issue. Again, while compelling state interests may justify infringing on even a fundamental right, if the infringement is narrowly tailored, they do not negate the existence or reduce the breadth of the right, contrary to the Court's analysis.

In *Parham v. J.R.*, the U.S. Supreme Court reviewed a Georgia statute's procedure governing the controversial practice of voluntary commitment of minors to state mental hospitals. 442 U.S. at 588. While

the specific issue concerned the procedural due process rights of the child, the first step of the Court's analysis—examining the private interests affected by the state action—included a consideration of "the interests of the parents who have decided, on the basis of their observations and independent professional recommendations, that their child needs institutional care." *Id.* at 601–02. In analyzing that interest, the Court explained that its "jurisprudence historically has reflected Western civilization concepts of the family as a unit with *broad* parental authority over minor children." *Id.* at 602 (emphasis added). "Surely," the Court held, a parent's right to make decisions concerning her children "includes a 'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Id.* Because these rights and duties are so intertwined, parents "retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment." *Id.* at 604.[22]

This Court, following suit, has acknowledged the "'high duty' to recognize symptoms of illness and to seek and follow medical advice" to

---

[22] The Court dismisses *Parham* for being a procedural due process case in which the U.S. Supreme Court did not "suggest[] that it was recognizing a substantive constitutional right for parents to obtain novel medical care for their children." *Ante* at 22. The Court fails to address *Parham*'s discussion of the breadth of parental autonomy, which included medical decision-making for one's children. As discussed previously, the U.S. Supreme Court has steadfastly recognized a fundamental right of parents to direct the upbringing of their children, even though the Justices are not aligned on the source of that right. *C.J.C.*, 603 S.W.3d at 812 (citing *Troxel*, 530 U.S. at 80 (Thomas, J., concurring)).

23

be foundational under Texas law as well.[23] *Miller v. HCA, Inc.*, 118 S.W.3d 758, 766 (Tex. 2003) (quoting *Parham*, 442 U.S. at 602); *see also T.L. v. Cook Child.'s Med. Ctr.*, 607 S.W.3d 9, 43 (Tex. App.—Fort Worth 2020, pet. denied) ("This right includes the right of parents to give, withhold, and withdraw consent to medical treatment for their children."); *In re Zook*, No. 03-21-00180-CV, 2021 WL 2964264, at *2–3 (Tex. App.—Austin July 15, 2021, orig. proceeding); *In re Womack*, 549 S.W.3d 760, 766 (Tex. App.—Waco 2017, orig. proceeding [mand. denied]) ("Accordingly, under the plain language of subsection 32.101(c), [DFPS], having actual knowledge that [the parents] have expressly refused to give consent to [their child's] being immunized, may not consent to [the child's] being immunized."). Even when parents' decisions contradict recommended medical treatment, their right to guide the well-being of their children, while not unchecked, is protected by the Constitution.

Here, the Legislature has superseded parental decision-making entirely to *prevent* the provision of medical treatment recommended by a medical consensus because the Legislature happens to disagree with that consensus. Our precedent demonstrates why that policy choice goes too far. *See Miller*, 118 S.W.3d at 767 ("[A]s long as parents choose from

---

[23] Entirely unaddressed by the Court is the duty of parents, as a matter of both natural and statutory law, to seek out medical care for their children when needed. *See* TEX. FAM. CODE § 151.001(a)(3) (enumerating a parent's *duty* to "provid[e] the child with clothing, food, shelter, *medical and dental care*, and education" (emphasis added)); *see also id.* § 151.001(a)(6) ("A parent of a child has . . . the right to consent to the child's marriage, enlistment in the armed forces of the United States, medical and dental care, and psychiatric, psychological, and surgical treatment . . . .").

professionally accepted treatment options the choice is rarely reviewed in court and even less frequently supervened." (citing *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 627 n.13 (1986))).  If the right to reject recommended medical advice is protected by the Constitution, surely the ability to follow recommended medical advice is similarly protected. Contrary to the Court's deference to the Legislature today, "[d]etermination by the Legislature of what constitutes proper exercise of [plenary] power is not final or conclusive but is subject to supervision by the courts."  *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923).

## C. The Court's Ad Hoc Approach to Parental Rights Is Unprecedented.

Importantly, fundamental rights are not to be dissected into separate parts that are treated differently for purposes of constitutional protection.  Nonetheless, the Court's opinion today does just that.  The right of parents to direct whether their child should receive treatment for gender dysphoria is squarely encompassed within the broader fundamental right of parents to make medical decisions for their children.  That right must be scrutinized accordingly.

As noted, this right of parental autonomy is among the "vital rights . . . that courts must protect from fleeting majoritarian whim." *Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 666 (Tex. 2022) (Young, J., concurring).  Thus, "the State may legitimately interfere with family autonomy" in only limited circumstances, such as "to protect children from genuine abuse and neglect by parents who are unfit to discharge the 'high duty' of 'broad parental authority over minor children.'"  *A.M.*, 630 S.W.3d at 25 (citing *Parham*, 442 U.S. at 602).  This right, as this Court has articulated it

throughout our history, has *always* been defined broadly. For example, in cases involving grandparents seeking court-ordered visitation, which requires overcoming a high statutory hurdle, the underlying constitutional right giving rise to that hurdle is not a parent's stand-alone right to prevent his children from seeing their grandparents, but a broader right to make decisions concerning "the care, custody, and control of [his] children." *E.g.*, *In re Derzapf*, 219 S.W.3d 327, 334–35 (Tex. 2007) (citing *Troxel*, 530 U.S. at 65). The Court's analysis in these cases reflects an understanding that this fundamental right is not subject to ad hoc dissection.

In attempting to carve out an exception to parental medical decision-making rights, the Court concludes that novel concepts—or at least, *some* novel concepts—are not entitled to strict scrutiny. The Court relies on *Washington v. Glucksberg*, 521 U.S. 702 (1997), for the proposition that a novel concept is not subject to strict-scrutiny review. In *Glucksberg*, the new fundamental liberty interest at issue was assisted suicide; the Court held that this was not protected by substantive due process. *Id.* at 709. In analogizing gender-affirming care to assisted suicide (because they both involve "novel concepts"), the Court concludes that governmental prohibition of treatment for gender dysphoria is subject to rational-basis review. Leaving aside that gender nonconformity is not in fact a novel concept, *see supra* note 5, the Court overlooks that a decision to provide gender-affirming treatment to a minor is a subset of the recognized fundamental right of parental decision-making, while assisted suicide is not. Today we are not asked to "break new ground in this field" as was required in *Glucksberg*—the

26

right to assisted death had never been recognized as fundamental. Rather, we are asked to acknowledge a right that has long been recognized as fundamental, *see, e.g.*, *Parham*, 442 U.S. at 603, and to apply the analysis that has long been required. The Court dissects the fundamental right of a parent to make medical decisions for their children into separate parts that are entitled to differing levels of constitutional protection based upon whether the decision involves novel concepts. In so doing, the Court dilutes the very essence of this basic constitutional right.

**D.      S.B. 14 Does Not Survive a Strict-Scrutiny Review.**

Because the parental right at issue is fundamental, we must apply strict scrutiny. *Reno v. Flores*, 507 U.S. 292, 301–02 (1993) (applying strict scrutiny to the denial of fundamental liberty interests). For S.B. 14 to survive such review, the law must be narrowly tailored in pursuit of a compelling state interest. *See Glucksberg*, 521 U.S. at 721 (noting that the Fourteenth Amendment of the U.S. Constitution forbids the government from infringing on fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest); *see also Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019) (applying strict scrutiny to a state program that involved the ongoing storage of infants' blood samples collected without parental consent because it violated their fundamental rights to direct the medical care of their children).

As discussed, the established medical community's acceptance of the prohibited medical treatments when warranted significantly dilutes

the State's interest in protecting children from the effects of such treatment. However, even assuming the existence of a compelling state interest, S.B. 14 is in no way narrowly tailored. Rather, the Legislature has decided unilaterally, and categorically, that medical treatment for minors with gender dysphoria is off the table as a therapeutic option without any consideration for the individual needs of any unique child. No evidence was presented in the case that the parent–plaintiffs were doing anything other than following medical advice and their own consciences about the best way to care for their children. *Cf. In re Abbott*, 645 S.W.3d 276, 287 n.3 (Tex. 2022) (Lehrmann, J., concurring) ("In my view, a parent's reliance on a professional medical doctor for medically accepted treatment simply would not amount to child abuse."). Certainly, no evidence was presented that the parents were either intentionally or negligently harming their children. To the contrary, the evidence indicated that each parent was diligently and thoughtfully seeking medical advice about how best to deal with the difficult and sensitive situations in which they found themselves. As such, the Court today allows the State to substitute its judgment for that of conscientious parents—who, again, are seeking and following professional medical advice—regarding how best to care for their children. And the Court allows this substitution without subjecting the State's action to *any* meaningful scrutiny.

Because the Court applies a rational-basis review, it does not address whether S.B. 14 would survive strict scrutiny. The State argues that it would for two reasons. First, the State argues that parents' historic rights to the custody and care of their children do not extend to

28

"ill treatment or cruelty." Second, it contends the Legislature has correctly determined as a policy matter that the prohibited treatments are too risky to be performed on children who lack the maturity to understand long-term consequences. *Id.* Neither of these justifications is sufficient to withstand strict scrutiny.

First, as noted, nothing in the record indicates, and the State has never argued, that the parent–plaintiffs were acting out of cruelty or ill intent. The State does not accuse these parents, or other parents of children receiving medical treatment for gender dysphoria, of "genuine neglect or abuse" justifying state interference. The State also put on no evidence of doctors in Texas overprescribing unnecessary medical intervention to children for whom it is not medically indicated. Instead, the State relied on sweeping claims that the entire medical establishment in America cannot be trusted; the State did not even attempt to argue that any significant or mainstream portion of the medical community agrees with its position. Indeed, as noted, the State's own expert witness described his position as "essentially me versus the entire medical establishment." The sheer breadth of the State's claim is astonishing. The State justifies a piece of legislation by assuming that the doctors who disagree with it—the overwhelming majority of physicians—are all acting in bad faith and violating their Hippocratic oath.

Second, by framing S.B. 14 as fundamentally a policy decision based on risks to children, the State directly undercuts any valid narrow-tailoring argument. *Parham*, 442 U.S. at 603 ("Simply because the decision of a parent . . . involves risks does not automatically

29

transfer the power to make that decision from the parents to some agency or officer of the state."). Nothing about S.B. 14 is narrowly tailored to ensure children are given proper medical care. S.B. 14 prohibits certain medical treatments *only* for the purpose of transitioning a child's biological sex, or for affirming the child's gender identity if that identity is incongruent with their biological sex at birth. If a child is prescribed hormone therapy to treat precocious puberty, prostate or breast cancers, or polycystic ovary syndrome, the law leaves the decisions to the medical community and their patients entirely. The State finds no risk in the medical treatments themselves, even for children. Here, the State seeks to intervene because it disagrees with the parents' decisions to pursue gender-affirming care of any kind for their children, regardless of any individual child's medical needs.

Notably, the WPATH or Endocrine Society guidelines could have been used by the State as part of a tailored approach to regulating gender-dysphoria treatment. These guidelines have built-in measures to ensure that drastic medical intervention is not a first step or hasty recommendation. The State's concern over the risks of mis-, or over-, prescription—again, a concern that I share—would be directly served by regulation encompassing something like the WPATH or Endocrine Society guidelines. However, the Legislature instead chose to ignore these thoughtfully crafted standards. Because the Legislature adopted a categorical prohibition, it cannot withstand the scrutiny our Constitution requires of State intervention in parental medical decision-making. After all, "the statist notion that governmental power should supersede parental authority in *all* cases because *some* parents

abuse and neglect children is repugnant to American tradition." *Parham*, 442 U.S. at 603 (emphases added). However compelling the State's concerns may be, a law that prevents parents from acquiring individualized medical treatment for their children, and instead imposes a categorical bar, because *some* children may not need *some* treatments cannot be held to be narrowly tailored.[24]

### III. Conclusion

The political and moral implications of gender-affirming care have led to extreme disparities in the State's treatment of parents with children diagnosed with gender dysphoria and parents of children with other medical needs. But the Legislature does not get to decide when it must respect the fundamental rights of Texans. Because the Court permits the State to legislate away fundamental parental rights without the scrutiny required by our Constitution, I respectfully dissent.

Debra H. Lehrmann
Justice

**OPINION FILED:** June 28, 2024

---

[24] Because I conclude that S.B. 14 is unconstitutional under the Due Course Clause, I express no opinion on the claim that the law also violates the Equal Protection and Equal Rights Clauses of the Texas Constitution.

31